NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Plaintiff,

v.

Joseph CALIFANO, Secretary of the United States Department of Health, Education and Welfare, Defendant,

Association for Intercollegiate Athletics for Women and American Alliance for Health, Physical Education and Recreation, Defendant-Intervenors,

National Education Association and United States National Student Association, Defendant-Intervenors.

Civ. A. No. 76–32–C2.

United States District Court, D. Kansas.

Jan. 9, 1978.

John J. Jurcyk, Jr., of McAnany, Van Cleave & Phillips, Kansas City, Kan., Philip B. Brown, Washington, D. C., Charles F. Clarke, Cleveland, Ohio, Michael Scott, and William D. Kramer, of Cox, Langford & Brown, Washington, D. C., George H. Gangwere, Jr., of Swanson, Midgley, Gangwere, Thurlo & Clarke, Kansas City, Mo., for plaintiff.

James P. Buchele, U. S. Atty., Douglas Comer, Asst. U. S. Atty., Kansas City, Kan., Barbara Allen Babcock, David J. Anderson, Jack E. Thornton, Jr., Dept. of Justice, Washington, D. C., Alexandra Buek, Dept. of Health, Education and Welfare, Washington, D. C., for defendant, Joseph Califano.

LaVone A. Daily, of Scott, Daily & Vasos, Kansas City, Kan., Katrina Renouf and Margaret Polivy of Renouf, McKenna & Polivy, Washington, D. C., for defendant-intervenors, Association for Intercollegiate Athletics for Women and American Alliance for Health, Physical Education & Recreation.

Margaret A. Gatewood, Topeka, Kan., Marcia D. Greenberger and Margaret A. Kohn, Washington, D. C., Center for Law & Society Policy, Judith Lichtman, Washington, D. C., Women's Legal Defense Fund, Inc., for defendant-intervenors, National Education Association and United States National Student Association.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

The National Collegiate Athletic Association, a voluntary unincorporated association of some 707 four-year colleges and universities, has instituted the above-cited action for declaratory and injunctive relief seeking to invalidate regulations promulgated by the Department of Health, Education, and Welfare under the aegis of Title IX of the Education Amendments of 1972, P.L. 92–318, 20 U.S.C. §§ 1681–1686. The case is now before the court for determination of the motions to dismiss of the defendant HEW and the defendant-intervenors United States National Student Association (NSA), National Education Association (NEA), Association for Intercollegiate Athletics for Women (AIAW), and American Alliance for Health, Physical Education, and Recreation (AAHPER), and the cross-motions for summary judgment of the plaintiff, the defendant HEW, and the intervenors NEA and NSA; and the motion of NSA and NEA to postpone consideration of the defendant's motion for summary judgment. On April 11, 1977, the court heard oral argument on various issues addressed by the various motions. After having studied the parties' written presentation of the issues—possibly, it might be noted the most over-briefed presentation in the court's recent experience—the court is now prepared to render its judgment on those motions.

The background of this controversy may be summarized as follows: On June 23, 1972, Congress enacted into law the basic requirement that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, or denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ." 20 U.S.C. § 1681(a). On June 4, 1975, HEW, purportedly pursuant to its statutory authority to formulate regulations consistent with the achievement of the objectives of § 1681(a), issued certain regulations that construed, among other things, the application of Title IX in the context of "interscholastic, intercollegiate, club or intramural athletics." 45 C.F.R. Part 86; in particular, see 45 C.F.R. § 86.41. Such regulations became effective on July 21, 1975. Thereafter, on February 17, 1976, the NCAA

instituted the instant action seeking, on behalf of itself and its member institutions, declaratory and injunctive relief that the regulations so promulgated are invalid. More specifically, the NCAA's challenge is based upon the following arguments: (1) the HEW regulations purport to extend administrative jurisdiction over programs and institutions beyond the scope of the governing statutes in that they reach collegiate athletic programs that do not directly receive federal financial assistance; (2) the HEW regulations exceed the lawful scope of Title IX in that they purport to govern collegiate athletic programs offered by educational institutions which do not directly receive federal financial assistance but which offer non-athletic educational programs that receive or "benefit from" federal financial assistance; (3) the provisions of the regulations that purport to require that there be no difference in the treatment of male and female student-athletes, and thus purport to invalidate NCAA rules, are arbitrary and capricious; (4) the regulatory requirement that athletic scholarships and grants-in-aid must, if provided, "provide reasonable opportunities for members of each sex" creates an arbitrary and capricious sex-based quota system and violates 20 U.S.C. § 1681(b) as well as the Fifth Amendment of the United States Constitution; (5) HEW violated the literal language of 20 U.S.C. § 1682 and thus exceeded its authority in promulgating the challenged regulations without concurrently making express findings that said regulations were consistent with the objectives of each statute under which federal financial assistance may be awarded; and (6) the regulatory standards under which HEW professes to evaluate "equality of opportunity" are impermissibly vague and indefinite and thus allow HEW "unfettered and unimpeded discretion" in determining the existence of a violation, contrary to the due process requirements of the Fifth Amendment.

The defendant and the defendant-intervenors vigorously dispute each of these assertions. As a preliminary matter they argue, however, that the court lacks jurisdiction to examine the merits of the plaintiff's position both because the NCAA lacks standing either in its own stead or as a representative of its member institutions and because the case presented is not justiciable. It is to these contentions that the court's attention must initially turn.

■ The inquiry as to standing must begin with a determination of whether the specific statute invoked as a basis for judicial review authorizes such review at the behest of the plaintiff whose standing is called into question. Here, as in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1971), the plaintiff relies upon § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." As the Supreme Court reiterated in the *Sierra Club* case, standing under 5 U.S.C. § 702 depends upon (1) whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise, and (2) whether the alleged injury is to an interest of the plaintiff that is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *E. g., Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969). The requirement of "injury in fact" under this test is one of constitutional dimension, for it is the existence of threatened or actual injury to the plaintiff that assures the presence of an Article III "case or controversy" within the constitutional power of a federal court to adjudicate. *E. g., Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). The "zone of interests" requirement, which addresses the source of the plaintiff's claim to relief, is in contrast not a constitutional rule but a "prudential" rule that serves to limit the courts' role in resolving public disputes. The essential question under the "zone of interests" requirement is therefore whether the constitutional or statutory provision on

which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1974).

█ In determining the question of standing in the context of a motion to dismiss, the trial court must accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). In the final analysis, however, it is the responsibility of the plaintiff clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. If in response to a challenge to the plaintiff's standing, the plaintiff has been allowed by way of amended complaint and various affidavits to advance further particularized allegations of fact deemed supportive of standing, and yet such standing does not adequately appear from all materials of record, the complaint must be dismissed. *Warth*, 422 U.S. at 501–502, 95 S.Ct. 2197. Viewing this case in light of these standards, the court must conclude for the reasons explained in further detail below that the NCAA lacks standing either on its own behalf or on behalf of its member institutions to litigate the claims alleged in the complaint.

█ There is no question but that as a theoretical matter, an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. *Warth*, 422 U.S. at 511, 95 S.Ct. 2197. In this context it is not sufficient that the plaintiff association merely demonstrates a long-standing interest or expertise in the subject-matter of the lawsuit. *Sierra Club*, 405 U.S. at 739, 92 S.Ct. 1361. The association must assert in allegations "true and capable of proof at trial" that it has itself suffered perceptible harm, for it is the statutory requirement of "injury in fact" that "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a

person with a mere interest in the problem." *United States v. SCRAP*, 412 U.S. 669, 689, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 (1972). No such injury as would enable the NCAA in its own behalf to litigate the claims advanced is alleged in the instant amended complaint.

The NCAA's amended complaint alleges that it is injured in three ways. First, it is alleged that the challenged HEW regulations purporting to establish standards for determining whether a particular educational institution is providing equality of athletic opportunity are so vague and indefinite that the NCAA is provided no meaningful standards by which its compliance with the law can be determined. The regulations are thus claimed to violate the due process clause of the Fifth Amendment. Second, it is argued that the plaintiff is injured as a result of HEW's purported invalidation of certain NCAA rules. Third, it is contended that if the members of NCAA elect to comply with the challenged regulations, the plaintiff association will suffer injury because it will either have to amend its rules to conform with the nondiscriminatory practices of its members or else be forced to expel from its membership those educational institutions that comply with the HEW regulations in question. In the court's view these allegations fall far short of alleging a "legal wrong" amendable to redress.

█ The first two allegations of "injury in fact" by NCAA are plainly not capable of proof at trial because they are premised upon grossly apparent misreadings of the relevant regulations. Said regulations apply only to "recipients" of federal finance assistance, a term defined in 45 C.F.R. § 86.2(h) as an entity "to whom Federal financial assistance is extended directly or through another recipient. . . ." Taking as true the NCAA's allegation that it receives no federal financial assistance— and noting that the NCAA raises no issue of possible direct applicability of the challenged regulations to the plaintiff association itself—the court is obliged to conclude that the administrative provisions in ques-

tion exert no direct regulatory effect upon the NCAA. If the HEW regulations impose upon the NCAA no duties of compliance, it necessarily follows that the NCAA cannot be injured by the allegedly vague and indefinite standards enunciated in 45 C.F.R. § 86.41(c). Furthermore, while the obligation of a "recipient" to comply with the challenged regulations is expressly stated by HEW to be "not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association," 45 C.F.R. § 86.6(c), the plaintiff's argument that this unlawfully purports to invalidate NCAA rules cannot suffice as a basis for proof of "injury in fact." In the first place, the court is aware of no authority for the proposition that the mere regulatory invalidation of a rule of a voluntary association—accompanied by no discernible ramifications other than the prospect of abandoning or rewriting the affected rule—constitutes any sort of injury remotely cognizable under Article III of the Constitution. Mere "injury" to an organizational rule clearly cannot in itself form a legitimate basis for standing. Otherwise, any association with an interest in a given subject sufficient to justify promulgation of a rule even remotely concerning that subject would be entitled to litigate any facet of a conflicting federal regulatory measure. Such a result would "authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process" and would thus undermine the legitimate constitutional objective of putting the decision as to whether review will be sought "in the hands of those who have a direct stake in the outcome." *Sierra Club*, 405 U.S. at 740, 92 S.Ct. at 1369. Perhaps even more important in the context of this case, however, is the fact that despite repeated queries by the defendants the NCAA here has cited not a single example of one of its rules that is allegedly abrogated by the challenged regulations. The NCAA professes—and its statement must be accepted as true—that all NCAA rules and eligibility standards apply equally to all "student athletes," be they male or female, and that nothing in the NCAA rules condones or requires sex discrimination in any facet of the athletic programs offered by its members. This being the case, it is difficult to perceive how the plaintiff has been or will in fact be perceptively harmed by the implementation of 45 C.F.R. § 86.-6(c).

The NCAA's third allegation of "injury in fact" is equally insubstantial. As noted above, the plaintiff claims that if its members elect to comply with the Title IX regulations, the NCAA will be forced either to expel them from membership for failure to abide NCAA rules or to amend NCAA rules to conform with the practices of its members and the regulations under attack. This specific argument runs as follows: (1) NCAA rules, while facially applicable to athletes of both sexes, have traditionally been applied almost exclusively to male athletes; (2) the defendant-intervenor AIAW, the women's counterpart of the NCAA, has traditionally governed women's intercollegiate athletics; (3) the NCAA and AIAW rules are not identical, but instead reflect significant differences in philosophy and in specific requirements relating to athletic scholarships and eligibility; (4) most NCAA members are also members of AIAW; (5) 45 C.F.R. § 86.41(a) requires that male and female athletes be treated identically; and (6) educational institutions are therefore prohibited from contemporaneously applying NCAA rules to men athletes and AIAW rules to women athletes. The NCAA contends that its members must therefore choose between applying the rules of the NCAA, applying those of the AIAW, or undertaking a "costly and arbitrarily-imposed revision of NCAA rules." The NCAA asserts that due to fear of loss of federal funds, it is most likely that its members will choose to violate NCAA rules. This course of action threatens injury to the NCAA because the association will be forced to bring expensive disciplinary or expulsive proceedings against its non-complying members. The NCAA asserts that the second most likely prospect is that its members will decide to revise its organizational

rules. This course of action threatens to injure the NCAA by forcing "arbitrary changes in its rules." There are numerous reasons why this line of reasoning cannot withstand logical scrutiny in the context of the factual record of this case.

First, it is apparent from the court's examination of the allegedly conflicting NCAA–AIAW rules that no actual conflict exists and that the NCAA's argument in this regard is utterly makeweight. The alleged conflicts cited by the NCAA are, *in toto*, as follows:

1. While the NCAA and the AIAW both limit the absolute number of financial aid awards that may be provided in each sport at any one time, their respective "maximums" are not identical.

2. NCAA rules permit, while AIAW rules prohibit, member institutions from financing the visits of prospective student athletes to their campuses.

3. NCAA rules permit, while AIAW rules prohibit, the award of athletically-related financial aid to student athletes for tutoring expenses and required course-related books.

4. NCAA rules prohibit, while AIAW rules permit, member institutions to hold open on-campus auditions for prospective student athletes.

It is obvious from even a cursory examination of these rules that in no instance does the NCAA require institutional conduct that the AIAW prohibits, or vice versa. Even assuming the correctness of the NCAA's argument that the challenged regulations categorically require its members to award identical numbers of athletic scholarships to male and female student athletes—a dubious proposition—none of the rules of either the NCAA or the AIAW prohibit this course of action. It is also clear that all member institutions may comply with both NCAA and AIAW rules by not financing the visits of prospective athletes to campuses, by not providing tutoring expenses, and by not holding on-campus auditions. The court therefore fails to see how the NCAA member institutions are in

any dire dilemma regarding compliance with NCAA rules, or to perceive how these allegedly conflicting rules are likely to motivate NCAA members to sever their ties with that association. From this standpoint, the facts adduced in support of the NCAA's assertion of standing simply will not support the inferences that the plaintiff seeks to draw therefrom.

■ Furthermore, the threatened "injuries" that the NCAA purports to suffer are without legal significance. Should the NCAA lose membership because it elects to bring enforcement proceedings to purge itself of members who might be deemed (in some manner unfathomable to the court) to violate NCAA rules by complying with the challenged regulations, any injury to its organizational interests would have to be deemed self-imposed. In addition, the court sees no logic in the argument that an unincorporated voluntary organization suffers a "legal wrong" or is "aggrieved" in its own right by the prospect of rule changes desired by the majority of its members. The court is aware of no legal authority that recognizes standing on the sole basis of such injuries, and it must conclude that the allegations of the amended complaint fail in this regard to assert an "injury in fact" to a cognizable legal interest of the plaintiff.

■ Even if the court were to hold, however, that the alleged injuries to the NCAA were true, capable of proof at trial, and legally cognizable, the court would be yet constrained to deny standing for an additional and critical reason: Article III of the Constitution requires that a federal court "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1975). In this case the threatened injuries—loss of membership and need to amend organizational rules—will occur, if at all, as a result of the actions and decisions of the NCAA's own members and not directly from the operation of the de-

fendant's challenged regulations. We thus are faced with an anomalous situation in which the injuries claimed to provide the basis of the plaintiff's standing will be caused by third parties (its members) who, while they are in a sense "before the court," became involved in this litigation only because the *plaintiff* purports to represent their interests. In this case there is no causal connection between the plaintiff's alleged injuries and the defendant's promulgation of the regulations contained in 45 C.F.R. Part 86. Further, and even more fatal to the NCAA's standing to sue on its own behalf, the prospect of any injury at all is both purely speculative and dependent upon the hypothetical actions of the very parties whose interests the NCAA purports to represent. In short, for all of the above-stated reasons, the court must conclude that the NCAA has alleged the existence of no such "injury in fact" as would entitle it to litigate in its own behalf the claims advanced in the amended complaint.

■ The court's analysis does not end here, however, for recent Supreme Court decisions have made it clear that even in the absence of injury to itself an association in some circumstances may have standing solely as a representative of its members. *Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. 2197. In *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court stated that the prerequisites of "associational standing" are met when "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." 97 S.Ct. at 2436. The possibility of representational standing under this test does not eliminate or attenuate the constitutional requirement of a case or controversy. Thus an association can have standing as the representative of its members only if it has alleged facts sufficient to make out a case or controversy had the members themselves brought suit. *Warth v. Seldin*, 422 U.S. at

516, 95 S.Ct. 2197. In evaluating whether the above requirements are present in this case, the court must be mindful that Article III requires at a minimum a "logical nexus between the status asserted and the claim sought to be adjudicated." *Flast v. Cohen*, 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). This constitutional provision may be satisfied if the interests of the NCAA members that are allegedly injured are arguably within the zone of interests sought to be protected or regulated by the relevant statutes *and if* protection of these interests is germane to the organizational purposes of the NCAA. It should go without saying, however, that representational standing to litigate issues of central concern to both the NCAA and its members does not confer upon the former a roving commission to litigate all issues that may merely affect its members or in which they share a common interest.

It is important to emphasize at the outset of our discussion that the avowed purpose of the NCAA is limited to the promotion and governance of intercollegiate athletics for men. It does not profess to represent its members' interests either in the promotion of intercollegiate athletic programs for women or in general physical education activities for members of either sex; indeed these interests are represented by distinct parties who have intervened as defendants in this action. Further, the NCAA does not (for good cause) purport to speak generally for post-secondary institutions of higher education on such all-encompassing matters of general administrative concern as curriculum and budget planning, academic freedom, internal governance, and so forth. The NCAA's interests are therefore not coterminus with or identical to the broader interests of all or any of its institutional members. In fact, however worthy the aims and programs of the NCAA may be within its proper sphere, some might view the purposes of the NCAA as inimical to legitimate overall interests and objectives of particular educational institutions. Whether the NCAA may be deemed an appropriate representative of its members

in this proceeding must therefore be examined in light of the fact that its representational capacity may be fairly said to extend to only the interests of its members in promoting intercollegiate athletic programs and activities for male student athletes. With this important limitation in mind the court must examine each of the claims alleged to constitute a basis for relief on behalf of the member institutions of the NCAA.

*COUNT I.* Count I of the plaintiff's complaint alleges that the challenged regulations are not applicable to the intercollegiate athletic programs of its members because no such programs are direct recipients of federal financial assistance. It further alleges that HEW's efforts to regulate said athletic programs on the theory that they "benefit from" the provision of federal financial assistance to non-athletic educational programs is unlawful. See 45 C.F.R. §§ 86.2(h), 86.33, 86.34(d), 86.37(c), and 86.-41. Promulgation of the purportedly invalid regulations is alleged to have the following effects at the plaintiff's member institutions: (1) institutions are presently making "substantial changes in the organization, operation, and budgeting of their individual intercollegiate athletic program;" (2) institutions are required to presently engage in "time-consuming and expensive programs of self-evaluation and affirmative action;" (3) institutions must immediately apply "substantial amounts of time and money to satisfaction of [the regulatory] directives, to the detriment of other legitimate educational purposes;" and (4) said institutions are deprived of the "freedom to determine the educational programs most suited to that institution, free from interference or regulation by the Federal Government." These alleged "injuries" to its member institutions form the basis on which the NCAA asserts representational standing to litigate Count I of the amended complaint. They are, in the court's view, an insufficient foundation.

■ Item (1) above, the only one of the four alleged injuries that could plausibly be said to relate to an issue within the purported representational capacity of the NCAA, does not assert any cognizable injury to the plaintiff's members. The Supreme Court held in *Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. at 2211, that representational standing depends upon an allegation that the association's members, or any one of them, "are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." Here, the complaint merely asserts that "changes" in the organization and operation of individual intercollegiate athletic programs are now occurring. Significantly, the amended complaint omits any suggestion that the member institutions—or more specifically, their men's intercollegiate athletic programs—are aggrieved, adversely affected, injured, or suffering any legally cognizable "wrong" as a result of the unspecified changes. Furthermore, the complaint alleges no facts which would permit any inference that the "changes" have had any such effect. In these circumstances, there appears to be no "case or controversy" between the defendant and the NCAA member institutions and, absent any suggestion of actual injury flowing from the defendant's conduct, the NCAA must be deemed to have failed "clearly to allege facts demonstrating that [it] is the proper party to invoke . . . the exercise of the court's remedial powers." *Id.* at 518, 95 S.Ct. at 2215.

■ Items (2), (3), and (4), citing injuries to the institutional members' rights to be free from the self-evaluation and affirmative action programs mandated by 45 C.F.R. § 86.3 and the regulatory restrictions of the exercise of their rights of internal budget control and academic freedom, likewise allege no sufficient basis for representational standing by the NCAA. First, the complaint gives no indication that these requirements pose a threat of injury to any of the limited interests that the NCAA is qualified to represent. The NCAA's effort to base standing on these claims must therefore be viewed as an effort merely to vindicate the value preferences of proponents of

men's intercollegiate athletic programs through the judicial process. Second, even if the interests for which the NCAA is a qualified spokesman could be deemed "injured" by the fact that institutions of post-secondary education are engaging in self-evaluation and affirmative action programs and are making internal budget realignments, it is highly unlikely that this situation would be redressed by a favorable decision in this case. The plaintiff does not directly challenge the validity of the regulation requiring affirmative action and self-evaluation. 45 C.F.R. § 86.3. Therefore, since the interests of men's intercollegiate athletics would not stand to benefit from "redress" of this "injury," the exercise of federal judicial power on this claim at the behest of the NCAA would be gratuitous and thus inconsistent with Article III of the Constitution. Furthermore, even assuming that the interests properly represented by the NCAA have been injured by budget cuts in the funding of intercollegiate athletic programs—an injury not in fact alleged in the complaint—there is no indication that such injury directly results from application of the challenged regulations. The NCAA has not alleged that budgetary adjustments would not have occurred if HEW's Title IX regulations had not been promulgated; thus, whether the desired exercise of the court's remedial powers in this suit would result in the availability of greater funding of men's intercollegiate athletic programs is a matter of pure speculation. The NCAA has thus failed to carry its burden of showing that any injury to interests for which it may properly speak is the consequence of the defendant's action. The NCAA in this regard relies on "little more than the remote possibility, unsubstantiated by allegations of fact, [that] situation [of its members' interests] might have been better had the [defendant] acted otherwise, and might improve were the court to afford relief." *Warth v. Seldin*, 422 U.S. at 507, 95 S.Ct. at 2209.

In summary, the court must conclude that Count I alleges no injuries in fact that are both causally related to the conduct of the defendant and are inflicted upon inter-

ests for which the NCAA is an appropriate representative. In these circumstances, any basis for representational standing by the NCAA is lacking.

*COUNT II.* Count I basically alleges that HEW's Title IX regulations cannot be *directly* applied to or enforced against intercollegiate athletic programs because they do not receive federal financial assistance and they cannot be forced to comply on the ground that they merely "benefit from" the provision of federal financial assistance to other educational programs and activities. Count II, in contrast, claims that the challenged regulations cannot be *indirectly* applied to or enforced against intercollegiate athletic programs, *i. e.*, post-secondary colleges and universities that receive or benefit from federal financial assistance for non-athletic programs and activities cannot be required to apply the challenged regulations to physical education and intercollegiate athletic programs that do not receive direct federal financial assistance in their own right. In essence, this claim is a prayer for a declaratory judgment generally advising all four-year colleges and universities that they need not make their intercollegiate athletic programs "toe the line" in compliance with Title IX and the regulations thereunder because even if regulatory enforcement proceedings should be later commenced against the universities, no loss of federal funds—either to athletic or to non-athletic programs—could be imposed as a sanction for sex discrimination in the area of intercollegiate athletic programs. In support of its argument that the NCAA has representational standing to seek judicial resolution of this claim the NCAA alludes by reference to the "injuries" cited in Count I as constituting legally redressable harm to the intercollegiate athletic interests of its members.

■ The Supreme Court has recognized that "[w]hen a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the per-

son harmed of standing to vindicate his rights." *Warth v. Seldin*, 422 U.S. at 505, 95 S.Ct. at 2208, citing *Roe v. Wade*, 410 U.S. 113, 124, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Nevertheless, in the specific context of Count II, this theory does not confer upon NCAA intercollegiate athletic programs standing to challenge the application of Title IX regulatory standards *by institutions of higher education* of which they are a component part. In the first place, as the court noted in its discussion of Count I, the amended complaint alleges no specific injuries to intercollegiate athletic programs that are presently occurring or that will occur if the challenged application of the regulations is upheld. Second, even if the requisite injury could be found in the allegation that colleges and universities are presently making "substantial changes in the organization, operation, and budgeting of their individual intercollegiate athletic programs," said injury could not be deemed to be one that any relevant statute or constitutional provision was intended to prevent. It would constitute no "legal wrong . . . within the meaning of a relevant statute," 5 U.S.C. § 702, and would thus be insufficient for purposes of standing. Finally, despite the complaint's allegation that many intercollegiate athletic programs are operated on budgets "separate from that of the institution as a whole" and in some instances are operated with a separate corporate framework, Count II is premised upon the fact that—Title IX questions aside—colleges and universities exercise legitimate control over the budgets and administrative and educational policies of intercollegiate athletic programs on their respective campuses. The court is therefore not confronted with a case in which "one party" causes palpable harm to some "third party," but with a case in which one educational program within a university seeks judicial leverage against other educational programs—indeed against the university as a whole—in order to enhance its intra-institutional political power to garner what it deems to be a "fair share" of the financial resources of the larger educational community and to preserve its departmental autonomy. While the possibility of attainment of these goals might—and undoubtedly *would*—be enhanced by judicial approbation of the plaintiff's claims, the court's failure to sustain the claim advanced in Count II would not cause to go unremedied an injury to any interest that is capable or deserving of judicial protection. Accordingly, for all of the reasons stated here and in connection with Count I, the court must conclude that the allegations of the complaint do not allege such injury in fact to the individual intercollegiate athletic programs at the plaintiff's member schools as would entitle the NCAA to sue on the theory of representational standing.

*COUNTS III and IV.* Counts III and IV, based upon 45 C.F.R. §§ 86.41(a) and 86.37, respectively challenge the defendant's regulatory directives that (1) "no person shall, on the basis of sex, . . . be treated differently from another person" in any intercollegiate athletic program offered by a recipient of federal financial assistance; and that (2) such recipients must, if they provide athletic scholarships, "provide reasonable opportunities for such awards to members of each sex participating in interscholastic or intercollegiate athletics." The NCAA does not allege that its members are aggrieved by promulgation of these regulations because they cause any discernible, tangible injury to the men's intercollegiate athletic programs for which the NCAA properly speaks. Rather, the NCAA claims that its members' compliance with said regulations will cause them to violate NCAA rules, "thereby jeopardizing their associational ties with the NCAA and the financial and educational benefits they derive therefrom." In the alternative, NCAA members will allegedly be required to collectively undertake "a costly and arbitrarily-imposed revision of NCAA rules." These arguments, for reasons previously discussed, must fall of their own overreaching weight.

In the first place, the NCAA has failed to cite a single example of an instance in which a member's compliance with the challenged Title IX regulations would necessarily violate an NCAA rule. In the second

place the NCAA has failed to cite a single example of an NCAA rule that would require "costly" revision if the challenged regulations should be implemented by its members. Finally, the suggestion that NCAA rules and AIAW rules require differential treatment of men and women athletes is totally without support in the record. The court must therefore conclude that the complaint alleges no distinct, palpable, immediate, or threatened injury to the associational ties between the NCAA and its members. Because no member of the NCAA would have standing in its own behalf to litigate Counts III and IV in the absence of such an injury, it follows that the NCAA cannot be accorded representational standing on these claims.

■ *COUNT V.* Count V alleges that contrary to the requirements of 20 U.S.C. § 1682, in the course of the rule-making proceedings culminating in issuance of the challenged Title IX regulations, HEW made no express findings that the regulations were consistent with achievement of "the objectives of the statute authorizing the financial assistance in connection with which the action is taken." Significantly, the NCAA does not argue that HEW's failure to make such findings has caused "injury in fact" to it, its members, or anyone else. Further, § 1682 imposes no requirement that HEW make such "findings" in any event. Finally, the NCAA does not allege that an inconsistency between any federal funding statute and the defendant's regulations in fact exists. Count V therefore fails to allege the existence of a justiciable case or controversy between the NCAA, as the representative of its member institutions, and the Department of Health, Education, and Welfare.

■ *COUNT VI.* Count VI of the amended complaint alleges that 45 C.F.R. § 86.41(c) is so vague and indefinite that the members of the NCAA are provided no meaningful standards by which their compliance with the law can be ascertained. That section provides that in determining whether equal athletic opportunity for members of both sexes is being provided by

a recipient of federal financial assistance, the Director of the Office for Civil Rights of the Department of Health, Education, and Welfare will consider, "among other factors," the following:

"(1) Whether the selection of sports and the levels of competition effectively accommodate the interests and abilities of members of both sexes;

"(2) The provision of equipment and supplies;

"(3) Scheduling of games and practice times;

"(4) Travel and per diem allowance;

"(5) Opportunity to receive coaching and academic tutoring;

"(6) Assignment and compensation of coaches and tutors;

"(7) Provision of locker rooms, practice and competitive facilities;

"(8) Provision of medical and training facilities and services;

"(9) Provision of housing and dining facilities and services;

"(10) Publicity."

45 C.F.R. § 86.41(c) further provides,

"Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Director may consider the failure to provide necessary funds for teams of one sex in assessing equality of opportunity for members of each sex."

In the court's view, Count VI does not state a case or controversy that is ripe for judicial determination. In the first place, wholly aside from the question of ripeness, it is doubtful whether any "case or controversy" whatsoever is alleged in Count VI. The factors listed in § 86.41(c) do not affirmatively impose any substantive duties of compliance upon the NCAA or its members; they merely outline the factual circumstances that will be considered by the Director in ascertaining whether equal athletic opportunity is being provided by those to whom the substantive directives of

§ 86.41 apply. The factors challenged as being unconstitutionally vague neither add to nor detract from the substantive duties of compliance imposed by statute, nor do they themselves purport to create a statutory offense. They do not constitute a standard for judging factual situations that is binding upon a federal district court, but merely explicate the circumstances that may warrant—and the policy that will guide—enforcement proceedings on behalf of HEW. See *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *United States v. Pennsylvania Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1972); *cf. United States v. Mersky*, 361 U.S. 431, 80 S.Ct. 459, 4 L.Ed.2d 423 (1960). The regulatory provisions that *do* impose substantive duties of compliance may be judicially enforced only if they are consistent with the statutes under which they are promulgated, and this question may be a matter of legitimate judicial inquiry at an appropriate time. Yet the NCAA does not argue that the relevant statutes are impermissibly vague or that it or its members may be ultimately required to suffer sanctions for conduct that they could not be reasonably apprised would constitute a violation of the law. It is therefore difficult to perceive how regulatory vagueness in itself has caused injury to the plaintiff. No such immediate or threatened injury is in fact alleged, and the court therefore entertains serious doubts that Count VI alleges a case or controversy within the meaning of Article III of the Constitution.

More crucial to the court's view that Count VI is not justiciable, however, is the fact that "declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1966). In this case, the regulations purporting to define what factors shall be considered by the Director are not alleged to have any impact upon the primary conduct of regulated enti-ties, and the court is not confronted with a situation in which the promulgation of § 86.41(c)(1)–(10) can be said "to be felt immediately by those subject to [the challenged regulations] in conducting their day-to-day affairs." *Toilet Goods Assn. v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1966). The impact of the regulation is therefore not sufficiently direct and immediate as to render the issue appropriate for judicial review at this time. Furthermore, there is no indication in the record that withholding judicial consideration of Count VI at this time will cause hardship to the parties. No administrative proceedings to terminate or refuse to grant federal financial assistance for noncompliance with Title IX and the implementing regulations may be brought until HEW "has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 20 U.S.C. § 1682. Relevant regulations further provide that the responsible government official "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance . . . and shall provide assistance and guidance to recipients to help them comply voluntarily." 45 C.F.R. §§ 80.6(a) and 86.71. Here the plaintiff makes no allegation of having sought administrative elucidation of the statutory standards by which the conduct of it and its members will purportedly be judged. In these circumstances the claim that 45 C.F.R. § 86.41(c) is unconstitutionally vague because it provides no meaningful standards of compliance is not ripe for judicial consideration. Furthermore, there are many procedural bridges that must be crossed before the plaintiff and its members may be sanctioned for any violation of the relevant statutes or regulations. See 20 U.S.C. § 1682; 45 C.F.R. §§ 80.7(c) [investigation]; 80.7(d) [informal conciliation efforts]; 80.8(c) [administrative determination that compliance cannot be had by voluntary means]; 80.9(a) [hearing resulting in finding of noncompliance]; 80.10 [administrative review]; 80.10(e) [review in certain cases by the secretary]; and 80.8(c) [full reporting to appropriate legislative commit-

tees]. In addition, any administrative enforcement action pursuant to 20 U.S.C. § 1682 is subject to judicial review. 20 U.S.C. § 1683; 45 C.F.R. § 80.11. In these circumstances, the allegation that the defendant HEW has "unfettered discretion" to find violations of the substantive requirements of 45 C.F.R. § 86.41(a) is clearly not ripe for decision.

The Supreme Court has observed that the "basic rationale" of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*, 387 U.S. at 148, 87 S.Ct. at 1515. These dual purposes are best served in this case by declining pre-enforcement judicial review of the claims advanced in Count VI. Here, as was true in *Toilet Goods Assn. v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1966), judicial appraisal of all relevant factors is "likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here." At this juncture we have no idea whether or when enforcement proceedings will be ordered against the plaintiff or its members, what grounds might be advanced as a basis for such proceedings, or whether the administrative regulations sought to be invoked against the parties might be arguably unjustified by reference to the statutory scheme as a whole. Judicial consideration of the claims in Count VI would merely embroil the court in abstract disagreement over the scope and validity of the entire Title IX regulatory scheme so far as it relates to athletic programs and activities at the post-secondary educational level. Because the parties have through various possibilities of judicial review an adequate forum for testing the provisions of 45 C.F.R. § 86.41 in a concrete enforcement situation, the court sees neither a practical need nor a lawful excuse for pre-enforcement review of the kind sought here.

In summary, for the reasons discussed above, the court finds that Counts I–V of the plaintiff's amended complaint fail to allege any "injuries in fact," both causally related to actions of the defendant and for which the NCAA is an appropriate spokesman, to any of the members of the NCAA. Accordingly, in the absence of any alleged injury to the NCAA itself, the NCAA must be denied standing to litigate Counts I–V in a purely representational capacity. Further, Count VI must be dismissed as being unripe for judicial consideration. This action is therefore not properly before the court and, in these circumstances, the motions to dismiss of the various defendants herein must be sustained. This disposition of the motions to dismiss renders unnecessary any discussion of the remaining motions in the case.

IT IS THEREFORE ORDERED that the motions to dismiss of the defendant Department of Health, Education, and Welfare and the various defendant intervenors be and hereby are sustained. Counsel for the defendant shall prepare, circulate, and forward for the court's approval and signature a Journal Entry of Judgment dismissing this action and reflecting the holdings of the foregoing Memorandum and Order.