John DOE, on behalf of himself and all others similarly situated, the Kansas Civil Liberties Union, representing John Doe on behalf of himself and all others similarly situated, Diana Gurley, on behalf of herself and all others similarly situated, and Dr. Jan Flora, on behalf of himself and all others similarly situated, Plaintiffs,

v.

Curt SCHNEIDER, and in his official capacity as Attorney General of the State of Kansas, and William Albott, and in his official capacity as Director of the Kansas Bureau of Investigation, Defendants.

Civ. A. No. 75–38–C6.

United States District Court,
D. Kansas.

Jan. 13, 1978.

E. L. Kinch, Robert R. Arnold, Wichita, Kan., Terry D. Watson, Topeka, Kan., Jack D. Novik, American Civil Liberties Union Foundation, New York City, for plaintiffs.

Michael B. Rees and Michael C. Cavell, Asst. Attys. Gen., Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

### I.

Defendant Schneider is the Attorney General of the State of Kansas. Shortly after taking office in January of 1975, Mr. Schneider announced that he had discovered the existence of hundreds of files kept by the Kansas Bureau of Investigation (KBI), which, in his opinion, had little or no law enforcement value. The Attorney General reportedly stated that the subjects of the files were public officials and private individuals who had never been charged with a crime, and was further quoted as stating that the files consist of "gossip," and "smack of invasion of privacy." The Attorney General later announced that 73 of the files in question would be destroyed, and the remainder would be reviewed thoroughly and destroyed if they were found not to have "relevant material." (See Exhibits attached to plaintiffs' complaint).

Before any action was taken on the Attorney General's directive to destroy certain of the files, this lawsuit was filed. Plaintiffs do not (in this action) seek damages for invasion of privacy; instead they seek an order from this court directing the defendants to turn over each file to the individual who is the subject of that file. Once aware of what is contained in the file, the individuals themselves will be able to determine whether and to what extent they have been damaged, and decide whether or not to bring an action for damages for invasion of privacy.

The following "statement of the case" was provided by the plaintiffs in their amended complaint, and reiterated in their suggestions in opposition to the defendants' motion to dismiss:

"This is a civil rights action for equitable, specifically, injunctive, relief:

a) to enjoin the defendants from destroying any and all Kansas Bureau of Investigation files now in their possession, custody and control that contain information on individual citizens that has no lawful or valid law enforcement purpose; and

b) to compel the defendants to deliver said files, any and all copies thereof, including microfilm or similar copies, and log sheets or other records showing any and all parties who had access thereto, to this Court in order that this Court may and shall notify all individual citizens whose names appear in said files that said information is contained in said files pertinent to them and to provide said citizens access thereto, with or without counsel, for examination and copying thereof within a reasonable time following said notification. (This is *not* an action for damages.)

The plaintiffs' request for injunctive relief herein is based on their *right of access* to the federal courts guaranteed by Acts of Congress, the due process and privileges and immunities clauses of the Fourteenth Amendment and the First, Fifth and Sixth Amendments to the Constitution of the United States for the redress of deprivations of civil rights.

Although the action is not an action for damages, the injunctive relief requested by the plaintiffs herein is essential to the plaintiffs' and others' rights to sue for damages for:

a) deprivations of Constitutional rights of the First Amendment (including the rights to privacy, freedom of expression, speech, assembly, association and religion and to petition the government for redress of grievances), the Fourth Amendment (including the rights to privacy and to be free from unreasonable search and seizure), the Fifth Amendment (including the rights of privacy, and due process), the Ninth Amendment (including the right to privacy), and the Fourteenth Amendment (including the rights to due process, privacy, liberty, equal protection, privileges and immunities, to be free of arbitrary state action exceeding the le-

gitimate police power of the state, *i. e.,* abuse of power, privacy and property); and

b) deprivations of civil rights provided by 18 U.S.C. 2520, 42 U.S.C. 1983, 1985, 1986 and 1988; and

c) tort injury under the common law for defamation (including libel and slander) and invasion of privacy.

This action arises under 42 U.S.C. 1983 in conjunction with the First, Fifth, Sixth and Fourteenth Amendments; this Court has jurisdiction thereof under 28 U.S.C. 1343(3) and (4)." (Emphasis *not* supplied).

Plaintiffs have provided us with the following characterizations of themselves:

"1. John Doe is a citizen whose name appears in a file or files now in the possession and custody of the defendants, said file or files pertinent to him containing information that has no lawful or valid law enforcement purpose.

2. The Kansas Civil Liberties Union is an association which has a unique function and goal as an organization to safeguard the Constitutional and civil rights of all citizens in litigation representation which seeks vindication of governmental deprivation of civil rights; it has an interest in all governmental intrusions of Constitutional and civil rights of citizens and stands ready to represent any citizen so affected *pro bono.*

3. Diana Gurley is a citizen-resident of Topeka, Kansas, who wishes to know whether her name is contained in any file or files in the possession and custody of the defendants, said file or files containing information that has no lawful or valid law enforcement purpose; further, whether any file or files contain information about her that has no lawful or valid law enforcement purpose.

4. Dr. Jan Flora is a citizen-resident of Manhattan, Kansas, and a teacher at Kansas State University, Manhattan, Kansas, who has reason to believe that his name appears in a file or files now in the possession and custody of the defendants, said file or files pertinent to him containing information that has no lawful or valid law enforcement purpose."

In addition, plaintiffs attempt to bring this lawsuit as a class action. The class is described as consisting of John Doe, Dr. Jan Flora, Diana Gurley, and all persons similarly situated, and the members of plaintiff KCLU.

Shortly after the commencement of this action, defendants agreed to, and the court entered an order directing the defendants to refrain from destroying any of the files in question pending determination of the case.

Defendants have filed a joint motion to dismiss. The motion is premised on three arguments: (1) the plaintiffs lack standing to sue; (2) this action is barred by the immunity granted to the State of Kansas under the Eleventh Amendment to the United States Constitution; and (3) plaintiffs have failed to state a claim for violation of their constitutional right of access to the courts.

Over the past two years, the parties have thoroughly briefed their respective positions. After giving this matter thorough consideration, the court has determined that the motion to dismiss should be sustained because of plaintiffs' failure to state a claim for violation of their *constitutional right of access to the courts.*

II.

The theory upon which plaintiffs' cause of action rests is that their right of access to the courts will be violated if the files are not turned over to the persons to whom the files pertain. The essence of plaintiffs' argument is that individuals whose privacy has been invaded, but who may not be aware of it or may be unable to prove it, have an inherent "right to know" so that they may properly assess their damages, if any, and seek proper compensatory relief from a court. If the files are never re-

leased, the argument continues, the individuals harmed will never be able to seek relief in court, and will therefore have suffered injuries for which there are no remedies.

▮ The constitutional right of access to the courts is a concept which is nebulous at best. Even the constitutional origins of the right are unclear. Perhaps the right is most often regarded as springing from the Due Process Clause of the Fourteenth Amendment (as well as the Fifth Amendment). As early as 1885, the Supreme Court stated that the Fourteenth Amendment was intended, *inter alia*, that all persons "should have *like access to the courts* of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of anyone except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one a than are laid upon others in the same calling and condition . . ." (Emphasis supplied). *Barbier v. Connolly*, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923 (1885);[1] quoted with approval in *Truax v. Corrigan*, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254 (1921).[2]

The right of access to the courts is also spoken of in connection with the First Amendment. In *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971), Justice Black, speaking for the Court, stated:

"The common thread running through our decisions in *NAACP v. Button*, *Trainmen*, and *United Mineworkers*[3] is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation." 401 U.S. at 585, 586, 91 S.Ct. at 1082.

There is even a suggestion that the right of access to the courts may owe its birth in part to the "Privileges and Immunities Clause" found in Article IV, Section 2, Paragraph 1 of the Constitution, which states that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."[4] In *Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142, 28 S.Ct. 34, 52 L.Ed. 143 (1907), the Supreme Court stated:

"The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each State to the citizens of all other States to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the States, but is granted and protected by the Federal Constitution. *Corfield v. Coryell*, 4 Wash.C.C. 371, 380 [Fed.Cas. No. 3,230], per Washington, J.; *Ward v. Maryland*, 12 Wall. 418, 430 [20 L.Ed. 449], per Clifford, J.; *Cole v. Cunningham*, 133 U.S. 107, 114 [10 S.Ct. 269, 33 L.Ed. 538], per Fuller, C. J.; *Blake v. McClung*, 172 U.S. 239, 252 [19 S.Ct. 165, 43 L.Ed. 432], per Harlan, J." 207 U.S. at 148, 28 S.Ct. at 35.

On several occasions, the Supreme Court has struck down prison regulations or practices which interfered with an inmate's ability to communicate with the courts. In *Ex parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85

---

1. In *Barbier*, the Supreme Court upheld a local ordinance which prohibited washing and ironing in public laundries from the hours of 10:00 at night until 6:00 in the morning.

2. In *Truax*, the Supreme Court struck down an Arizona statute which stated that a person could seek injunctive relief against any tort feasors except ex-employees.

3. These cases will be cited and briefly discussed *infra*.

4. In addition, the Fourteenth Amendment states: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

L.Ed. 1034 (1941), a regulation required that all inmate communications with the courts be screened by the legal assistant to the parole board, and only those communications found to be worthwhile were then forwarded to the courts. Therein it was stated:

"The regulation is invalid. The considerations that prompted its formulation are not without merit, but the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus. Whether a petition for writ of habeas corpus addressed to a federal court is properly drawn and what allegations it must contain are questions for that court alone to determine." 312 U.S. at 549, 61 S.Ct. at 642.

In *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the issue was whether an inmate had the right to the assistance of other inmates in preparing writs. The court concluded:

"Since the basic purpose of the writ is to enable those unlawfully incarcerated to obtain their freedom, it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed." 393 U.S. at 485, 89 S.Ct. at 749.

In *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held that the right to the assistance of other inmates in preparing legal papers, first enunciated in *Johnson v. Avery*, was not limited to writs of habeas corpus, but also extended to actions brought under the Civil Rights Act of 1871. We find the following pertinent language:

"The right of access to the courts upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than does the Great Writ. The recognition by this Court that prisoners have certain constitutional rights which can be protected by civil rights actions would be diluted if inmates, often 'totally or functionally illiterate,' were unable to articulate their complaints to the courts. Although there may be additional burdens on the Complex, if inmates may seek help from other inmates, or from the inmate adviser if he proves adequate, in both habeas and civil rights actions, this should not prove overwhelming." 418 U.S. at 579, 94 S.Ct. at 2986.

The cases discussing the First Amendment aspects of the right of access to the courts deal almost exclusively with attempts by unions, or other organizations, to implement a plan affording legal assistance to its members. In each case, the Supreme Court held that a state could not refuse to allow implementation of the plan. In *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), the NAACP offered the services of attorneys employed by it and encouraged its members to bring suits to challenge racial discrimination. In *Brotherhood of Railroad Trainmen v. Virginia State Bar*, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), the union was advising injured members to obtain legal assistance before settling claims and recommending specific lawyers to handle such claims. In *United Mineworkers v. Illinois State Bar*, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967), the union had employed a staff attorney, "solely compensated by an annual salary," to handle the workmen's compensation claims of union members. In *United Transportation Union v. State Bar of Michigan, supra*, the union was recommending that members choose a lawyer from among a list provided by the union to handle their damage suits brought under the Federal Employers' Liability Act (FELA). The attorneys on the union's list had agreed to a contingent fee of not more than twenty-five percent of the amount recovered.

In 1971, the Supreme Court held that a state may not deny access to the courts to individuals who were seeking to obtain a divorce, but were unable to pay filing fees. *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct.

780, 28 L.Ed.2d 113 (1971). The Court was careful to note that a divorce is the "exclusive precondition to the adjustment of a fundamental human relationship" (401 U.S. at 383, 91 S.Ct. at 788), and the state holds an exclusive monopoly over the means for legally obtaining a divorce. Therefore, denying an indigent the right of access to the courts in this instance would be a denial of the right to be heard, and this would amount to a violation of the Due Process Clause of the Fourteenth Amendment. However, the Court severely limited the scope of *Boddie* with the following caveat:

"In concluding that the Due Process Clause of the Fourteenth Amendment requires that these appellants be afforded an opportunity to go into court to obtain a divorce, we wish to re-emphasize that we go no further than necessary to dispose of the case before us, a case where the *bona fides* of both appellants' indigency and desire for divorce are here beyond dispute. We do not decide that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any individual, for, as we have already noted, in the case before us this right is the exclusive precondition to the adjustment of a fundamental human relationship. The requirement that these appellants resort to the judicial process is entirely a state-created matter. Thus we hold only that a State may not, consistent with the obligations imposed on it by the Due Process Clause of the Fourteenth Amendment, pre-empt the right to dissolve this legal relationship without affording all citizens access to the means it has prescribed for doing so." 401 U.S. at 382–383, 91 S.Ct. at 788.

The narrowness of *Boddie* became more apparent just two years later in *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). In *Kras*, an indigent was challenging the requirement that he pay a filing fee as a prerequisite to filing a petition in bankruptcy. The district court, relying on *Boddie*, held the filing fee re-

quirement to be unconstitutional. The Supreme Court reversed, clearly intimating that the right to a discharge in bankruptcy was not as fundamental as the right to obtain a divorce. In addition, the element of state or governmental monopolization was missing, since "bankruptcy is not the only method available to a debtor for the adjustment of his legal relationship with his creditors." 409 U.S. at 445, 93 S.Ct. at 638.

Other cases which have mentioned the constitutional right of access to the courts do not reveal any particular pattern. The Fourth Circuit has recognized a cause of action under 42 U.S.C. § 1983 against a state court clerk whose negligence "impeded the filing of papers" and thus violated a prisoner's constitutional right of access to the courts. *McCray v. Maryland*, 456 F.2d 1 (1972). A federal court in Hawaii has found a violation of the constitutional right of access to the courts in the refusal of a Marine Corps officer to permit service on a Marine (in custody at a Naval Air Station) of a state court notice of hearing. The hearing pertained to a petition to have the Marine declared incompetent and to have a guardian appointed for him. *Application of Brux*, 216 F.Supp. 956 (D.Haw.1963). The Supreme Court has even intimated that an individual's overuse of the judicial system may constitute a violation of another individual's constitutional right of access to the courts. In *California Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court stated:

"A pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, *viz.*, effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" 404 U.S. at 513, 92 S.Ct. at 613.

## III.

■ From the foregoing, it is obvious that the constitutional right of access to the courts is an ill-defined concept which may have been used by courts and judges in various contexts with different connotations. It is interesting to note, for instance, that Justice Harlan, who authored the majority opinion in *Boddie v. Connecticut*, dissented in *NAACP v. Button, Brotherhood of Railroad Trainmen v. Virginia State Bar*, and *United Mineworkers v. Illinois State Bar*, and also dissented in part in *United Transportation Union v. State Bar of Michigan* (all cited *supra*). Meanwhile, Justice Black, who dissented in *Boddie*, was with the majority in *Button*, and wrote the majority opinions in *Railroad Trainmen, United Mineworkers*, and *United Transportation Union*.[5]

■ Although the right of access to the courts may be incapable of precise definition, we find some enlightenment by analyzing the right in terms of the type of protection it affords. The cases involving access to the courts deal exclusively with acts by the state or federal government, or by individuals, which thwart the availability of the *judicial machinery* to resolve disputes. In our view, the available precedent clearly demonstrates that the right of access refers only to the right to petition the courts for redress of grievances. None of the cases involve situations where a plaintiff has been permitted to obtain any information that would substantiate a *claim* under the guise of exercising his constitutional right of access to the courts. Thus, it has

been held to be a violation of the constitutional right of access to the courts to place restrictions upon the ability of an inmate to communicate directly and effectively with the courts;[6] to place unreasonable restrictions upon an organization's right to recommend and make available to its members certain lawyers who will handle claims and file lawsuits for the members;[7] to refuse to allow an individual to file a divorce petition because of his inability to pay a filing fee;[8] for a court clerk to negligently fail to file papers;[9] to refuse to allow an individual to be served with judicial process;[10] and to file so many frivolous claims against an individual that said individual is effectively prevented from having a meaningful day in court.[11]

■ Returning at last to the case at hand, we believe plaintiffs' claim that their constitutional right of access to the courts has been violated differs significantly from the claims discussed above. Plaintiffs are not in any sense complaining about the availability or functioning of the *judicial machinery* of the federal courts. Indeed, the presence of this lawsuit in and of itself may well be *prima facie* evidence of the fact that plaintiffs have not been denied access to the courts.[12] Instead, plaintiffs seek information relating to the *merits* of unspecified potential claims. They baldly allege that their constitutional right of access includes a "right to know" of any facts supporting a possible future cause of action. Such a "right to know" has nothing to do with the actual functioning of the courts or plaintiffs' access to them. We find no

---

5. For two examples of how recent federal district court opinions have struggled with the problem of forging a working definition of the constitutional right of access to the courts, see *In re Smith*, 323 F.Supp. 1082 (D.Colo.1971) and *In re Sarelas*, 360 F.Supp. 794 (N.D.Ill. 1973).

6. *Ex parte Hull, supra*; *Johnson v. Avery, supra*; *Wolff v. McDonnell, supra*.

7. *NAACP v. Button, supra*; *Brotherhood of Railroad Trainmen v. Virginia State Bar, supra*; *United Mineworkers v. Illinois State Bar, supra*; *United Transportation Union v. State Bar of Michigan, supra*.

8. *Boddie v. Connecticut, supra*.

9. *McCray v. Maryland, supra*.

10. *Application of Brux, supra*.

11. *California Transport v. Trucking Unlimited, supra*.

12. It has been held that a court may examine its own records in an effort to help determine whether or not a plaintiff has been denied access to the courts. *Conway v. Oliver*, 429 F.2d 1307 (9th Cir. 1970).

precedent to support plaintiffs' "right to know" theory, and we are unpersuaded by their argument that such a right exists within the framework of the constitutional right of access to the courts.

The defendants in this case are agents of a governmental entity—the State of Kansas—but unlike some defendants in other access to the courts cases, they have no control whatsoever over the judicial processes here involved (the federal courts), or their availability to plaintiffs. Nor have defendants been charged with the commission of some act which impedes the functioning of the judicial processes. This effectively removes the defendants from liability under the provisions of 42 U.S.C. § 1983. From the allegations of the amended complaint they have simply not deprived plaintiffs of "rights, privileges, or immunities secured by the Constitution and Laws of the United States."

■ The due process access to the courts cases are based upon a claim of discrimination wherein the courts are somehow allegedly less available to a certain litigant or class of litigants than they are to all others. As noted earlier, the Due Process Clause of the Fourteenth Amendment requires that persons have like access to the courts, and that the burdens placed upon one group of litigants be no greater nor less than those placed upon others. *Barbier v. Connolly*, *supra* ; *Truax v. Corrigan*, *supra*.

■ The court fails to see how the plaintiffs here are being treated any differently than any other person instituting a lawsuit. Every plaintiff has the duty of proving that there was a duty owing on the part of the defendant, that defendant breached that duty and as a result thereof plaintiff has been injured. Plaintiffs cannot relieve themselves from these burdens by merely alleging they are being denied their constitutional right of access to the courts. We cannot accept the contention that an unknowing individual's constitutional right of access to the courts is violated by potential defendants' failure to disclose to said individual that they have injured him. It may be true that many potential plaintiffs never

file suit because they are unaware of their potential causes of action. We do not believe, however, that such "unawareness" constitutes the denial of a legal right of constitutional proportions. Were we to accept plaintiffs' theory of relief, we would be establishing a rule that every potential defendant has an affirmative obligation to seek out potential plaintiffs and invite them to file suit. No such rule exists and this court is not about to stretch the law to a legal absurdity.

The First Amendment access to the courts cases are also of no help to plaintiffs. No contention is made that the defendants have done anything to prevent the plaintiffs from obtaining a lawyer, or filing suit, or otherwise expressing themselves as those cases would indicate. Certainly plaintiffs cannot claim that their First Amendment right of access to the courts is being violated simply because they cannot express what they do not know.

For the reasons stated, the court concludes from the allegations of the amended complaint that it appears beyond question that plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). It follows that defendants' motion to dismiss for failure to state a claim for violation of plaintiffs' constitutional right of access to the courts must be sustained.

■ Accordingly, it is not necessary for the court to reach defendants' arguments concerning standing and the Eleventh Amendment. Nonetheless, the court has thoroughly reviewed the standing issue and perhaps a few comments are in order. To establish standing, each plaintiff must (1) allege sufficient injury in fact, and (2) allege that the injury is arguably within the zone of interest to be protected by the constitutional guarantee in question. See *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *N.C.A.A. v. Califano*, 444 F. Supp. 425 (D.Kan.1978). The court be-

lieves that all of the plaintiffs, with the possible exception of Dr. Jan Flora, have failed to allege sufficient injury in fact and therefore lack standing. *E. g.,* *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *Warth v. Seldin, supra*; *N.C. A.A. v. Califano, supra.* Although Dr. Flora may have stated sufficient injury in fact, it would be a useless venture to attempt to determine whether or not he has fulfilled the second standing element, since the court has already ruled that the amended complaint does not state the existence of any constitutional guarantee from which a "zone of interest" could be projected.

Counsel for defendants will prepare, circulate and submit a Journal Entry of Judgment reflecting the court's decision herein. The previous order of the court enjoining the defendants from destroying any of the files in question shall remain in effect until further order of the court.

IT IS SO ORDERED.