622 F.2d 1382
 NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Plaintiff-Appellant,
v.
Joseph A. CALIFANO, Jr., Secretary of the United States
Department of Health, Education and Welfare,
Defendant-Appellee,
Association for Intercollegiate Athletics for Women;
National Education Association and United States
National Student Association,
Defendants- Intervenors-Appellees.
 No. 78-1632.
 United States Court of Appeals,
Tenth Circuit.
 Argued Jan. 22, 1980.
Decided April 17, 1980.
 
 Eben G. Crawford (William D. Kramer, Washington, D. C., with him on brief) of Squire, Sanders & Dempsey, Cleveland, Ohio (John J. Jurcyk, Jr. of McAnany, Van Cleave & Phillips and George H. Gangwere of Swanson, Midgley, Gangwere, Thurlo & Clarke, Kansas City, Mo., of counsel), for plaintiff-appellant.
 Linda M. Cole, Atty., Civil Division, Appellate Staff, Dept. of Justice (Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C.; James P. Buchele, U. S. Atty., Kansas City, Kan., Leonard Schaitman and Michael Kimmel, Attys., Civil Division, Appellate Staff, Dept. of Justice, Washington, D. C., on brief), for defendant-appellee.
 Margaret Polivy (Katrina Renouf, with her on brief) of Renouf, McKenna & Polivy, Washington, D. C., for defendant-intervenor-appellee Ass'n for Intercollegiate Athletics for Women.
 Margaret A. Kohn, Nancy Duff Campbell and Marcia D. Greenberger, of Center for Law & Social Policy, Washington, D. C. (Judith L. Lichtman of Women's Legal Defense Fund, Washington, D. C., of counsel), for defendants-intervenors-appellees Nat. Ed. Ass'n and U. S. Nat. Student Ass'n.
 Before McWILLIAMS, BARRETT and McKAY, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 The plaintiff, National Collegiate Athletic Association (NCAA), appeals from an adverse judgment entered after the District Court granted motions to dismiss the amended complaint. The issue presented is whether the NCAA has standing to sue on the amended complaint.
 
 
 2
 The NCAA is an unincorporated association of several hundred colleges and universities. Among its stated purposes are to "initiate, stimulate and improve intercollegiate athletic programs for student-athletes" and to "uphold the principle of institutional control of, and responsibility for, all intercollegiate sports". (First amended complaint, paras. 1 and 2). The NCAA brought this suit in behalf of itself and its members to challenge certain Health, Education and Welfare Department (HEW) regulations promulgated under Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681-86), and codified at 45 C.F.R. Part 86. The challenged regulations affect or apply to intercollegiate sports programs.
 
 
 3
 The NCAA asserts that HEW, in issuing the regulations, exceeded its authority under Title IX; that some of the regulations are arbitrary and capricious under the Administrative Procedure Act; that some of the regulations are unconstitutionally vague; and that some of the regulations create a sex-based quota system in violation of Title IX and the Fifth Amendment. Although the NCAA pled these legal theories as separate "counts" of the amended complaint, the amended complaint presents but a single claim, i. e., that the unlawful regulations will injure the NCAA and its members and that enforcement of the regulations should be enjoined.
 
 
 4
 Defendant HEW, and intervenors Association for Intercollegiate Athletics for Women (AIAW), National Education Association and United States National Student Association, filed motions to dismiss the amended complaint on the ground that the NCAA lacks standing to sue in either its own right or as a representative of its member colleges. The District Court agreed that the NCAA does not have standing, granted the motions and entered judgment dismissing the action. See opinion at 444 F.Supp. 425.
 
 
 5
 We reverse the judgment of the District Court. We hold that the amended complaint alleges facts which, if true, confer standing on the NCAA to sue in behalf of its members.
 
 I.
 General Law of Standing
 
 6
 The question of standing is "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In general, a plaintiff has standing to sue if he, or those he properly represents, have been "injured in fact" by the defendant's conduct (Data Processing Service v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)), and meet such other conditions on who may sue as Congress may have legislated.
 
 
 7
 "Injury in fact" means concrete and certain harm. It may be the out-of-pocket cost to a business of obeying a new rule of government (Hunt v. Washington Apple Advertising Comm'n., 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)), or the unwanted result of the government rule whether or not a pecuniary loss is sustained. Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). But the harm must be certain to happen. There must also be reason to think that the harm can be redressed by relief the court can grant. Such injury in fact is the one constant element in the judicial statements about standing.
 
 
 8
 The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204 (, 82 S.Ct. 691, 703, 7 L.Ed.2d 663) (1962). As refined by subsequent reformulation, this requirement of a "personal stake" has come to be understood to require not only a "distinct and palpable injury," to the plaintiff, Warth v. Seldin, 422 U.S. 490, 501 (, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343) (1975), but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct. Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 261 (, 97 S.Ct. 555, 561, 50 L.Ed.2d 450) (1977).
 
 
 9
 Duke Power Co. v. Carolina Env. Study Group, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).
 
 
 10
 Because the NCAA challenges the legality of agency action, it must satisfy not only the constitutional requirement of injury in fact, but also the standing requirement expressed in section 10(a) of the Administrative Procedure Act (5 U.S.C. § 702). Section 10(a) states, inter alia :
 
 
 11
 A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.
 
 
 12
 The wording of the statute is in the disjunctive. A plaintiff has standing to obtain judicial review of agency action if he has suffered a "legal wrong", or, if not, he has been otherwise "adversely affected or aggrieved by agency action within the meaning of a relevant statute".
 
 
 13
 The courts have long since agreed that a "legal wrong" is an invasion of a "legal right", that is, "one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." Tennessee Power Co. v. T. V. A., 306 U.S. 118, 137-138, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939).
 
 
 14
 The "adversely affected" language, on the other hand, has received different interpretations. The D. C. Circuit held in Kansas City Power & Light Company v. McKay, 225 F.2d 924, 932 (D.C.Cir.1955), cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780, that the plaintiff must be able to refer to a statute that uses the terms "aggrieved" or "adversely affected" and show that he is included within those terms. But in Data Processing Service v. Camp, supra, the Supreme Court eschewed a literal reading of the phrase "adversely affected or aggrieved by agency action within the meaning of a relevant statute" and held that it means "arguably within the zone of interests to be protected or regulated by the statute . . . in question." 397 U.S. at 153, 90 S.Ct. at 830. Thus, unless the legislative history shows the plaintiff to be clearly not within the statute's "zone of interests", and it rarely does, a court should demand no more than a sensible relation between some subject of the statute and the plaintiff's interest in the outcome of the litigation. Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 142, 143 n. 80 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791.
 
 
 15
 In our view, then, the NCAA's amended complaint must show: A legal wrong done to the NCAA or its members, or a sensible relationship between any provision of Title IX and any one of the goals of this suit (these, as we see them, are academic liberty in intercollegiate sports, the avoidance of money costs associated with obeying the HEW regulations, and others); an injury that the District Court can redress; and an injury that is certain and not speculative.
 
 II.
 Standing of The NCAA to Sue For Itself
 
 16
 We agree with the District Court that the NCAA does not have standing to sue in its own right. As the District Court noted, the challenged regulations can only be read to apply to the member colleges and not to the NCAA itself. The NCAA contends it will lose members and be impaired in its athletics rulemaking function (one of its chief functions) due to effects the regulations will have on its members.
 
 
 17
 All of the injuries are speculative. They might or they might not occur. "A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." United States v. SCRAP, 412 U.S. 669, 688-689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).
 
 
 18
 As the mechanism of the alleged injuries to itself, the NCAA identifies certain of the HEW regulations which assertedly mandate equal treatment of the sexes in intercollegiate sports generally and sports scholarships in particular. The NCAA concludes that inasmuch as its members follow NCAA rules for men's intercollegiate sports and AIAW rules for women's intercollegiate sports, and the NCAA and the AIAW rules differ, the members must react either by dropping out of the NCAA or by compelling the NCAA to change its rules at its own cost. But even if it is assumed that the colleges' adherence to both the NCAA and the AIAW rules would necessarily violate the challenged regulations, it does not follow that any of the member colleges will adopt a course of action damaging to the NCAA. The colleges might instead compel the AIAW to change its rules to match those of the NCAA. They might even decide to continue their intercollegiate sports programs as before and to incur the sanctions imposed by Title IX. Significantly, the amended complaint contains no allegation that the NCAA has lost a single member, or has had to change a single one of its rules on account of the HEW regulations. Thus, insofar as injury to the NCAA is concerned, the amended complaint invites a wholly advisory decision from the court, for such injury may never happen.
 
 III.
 
 19
 Standing of The NCAA to Sue For Its Member Colleges
 
 
 20
 With respect to the question of whether the NCAA has standing to sue in behalf of its members, we hold that the amended complaint was sufficient to withstand the motions to dismiss. The amended complaint discloses that the plaintiff's members would have standing to sue in their own right, that the plaintiff's stated purposes as an association make it a suitable proponent of its members' interests in this litigation, and that the issues to be resolved by the suit do not require the individual participation of the members. This is enough to confer standing on the association. Hunt v. Washington Apple Advertising Comm'n., supra.
 
 
 21
 (A)
 
 
 22
 The Members And "Injury in Fact"
 
 
 23
 The District Court concluded that the members of the NCAA would not have standing if they had brought this suit, and thus it found no basis for standing in the association. It did not find in the allegations of the amended complaint either injury to the members or a causal relation between the injury, if any, and the challenged regulations. One or more appellees have made objections to the effect that no "legal wrong" to the members is shown and that the members' interests as advanced by the NCAA are not within Title IX's "zone of interests". Some of the objections have arisen from an ungenerous reading of the amended complaint. Of course, the opposite approach is required. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. at 501, 95 S.Ct. at 2206.
 
 
 24
 We turn now to an examination of the allegations of the NCAA's amended complaint, which, if accepted as true and given a favorable construction, suffice to show injury to the NCAA's members.
 
 
 25
 First. According to the amended complaint, the members of the NCAA have committed substantial resources over many years to the intercollegiate athletic programs that today represent the status quo:
 
 
 26
 Each of the member institutions of the NCAA maintains a program of intercollegiate athletic competition for student-athletes enrolled at that institution. These programs in general have been built up over a period of many years, and today involve not only major annual expenditures of time and operating funds by the individual institutions, but also the development and maintenance of substantial plant and equipment devoted to athletic programs for both male and female student-athletes. (Amended complaint, para. 13).
 
 
 27
 Second. The amended complaint shows that colleges have limited amounts of money available for the intercollegiate athletics programs. The colleges operate the programs to attract the greatest number of spectators. This enables many NCAA members to subsidize some sports programs with the profits generated by a few popular ones:
 
 
 28
 These programs are designed and operated in response to demonstrated student, alumni and spectator interest, within the limits of athletic budget capacity. At many NCAA member institutions, certain intercollegiate sports are entirely self-supporting, and often provide all or most of the funds necessary to operate the entire intercollegiate athletic program for both males and females. (Amended complaint, para. 13).
 
 
 29
 Third. The amended complaint further alleges the colleges now must operate and budget the intercollegiate athletic programs differently. The challenged regulations are the direct cause. The phrase "arbitrary demands" drives home the point that the changes in the status quo are unwanted:
 
 
 30
 Application of the Regulations to the member institutions of the NCAA requires that they presently make substantial changes in the organization, operation and budgeting of their individual intercollegiate athletic programs, requires that they presently engage in time-consuming and expensive programs of self-evaluation and affirmative action, and requires that their intercollegiate athletic programs and activities be conducted in compliance with arbitrary demands of a Federally-imposed mandate. (Amended complaint, para. 14).
 
 
 31
 The amended complaint then cites specific provisions of the regulations which tell the colleges when they must obey.
 
 
 32
 Fourth. In light of the allegation that colleges aim to attract as many spectators as possible under the status quo, the inference must be drawn that changes in the status quo will reduce the colleges' "take" from intercollegiate athletic programs. The NCAA specifically alleges that its members must spend money to obey the regulations and are losing significant liberties:
 
 
 33
 The above-quoted directives of the Regulations require the NCAA member institutions immediately to apply substantial amounts of time and money to satisfaction of those directives, to the detriment of other legitimate educational purposes. Such requirements deprive the member institutions of the NCAA of the freedom to determine the education programs most suited to that institution, free from interference or regulation by the Federal Government. (Amended complaint, para. 14).
 
 
 34
 The District Court reasoned that injury to "education programs" generally does not necessarily mean injury to those intercollegiate sports programs that the NCAA is concerned about. Read in context, however, "education programs" is clearly meant to include intercollegiate sports programs. Intercollegiate sports programs are "education programs" under HEW's Title IX regulations (See 45 C.F.R. Part 86, Subpart D) and the District Court itself refers to men's intercollegiate sports as an "educational program". See 444 F.Supp. at 436.
 
 
 35
 From the amended complaint as a whole comes the NCAA's main contention that all of the regulations affecting intercollegiate sports, damaging as they are, exceed the scope of Title IX and violate the Constitution; yet the colleges must obey them under threat of loss of federal aid.
 
 
 36
 Without any doubt the members of the NCAA have sustained the injury in fact that the Constitution demands of a complaining litigant. Compulsion by unwanted and unlawful government edict is injury per se. Certainly the cost of obeying the regulations constitutes injury. See Hunt v. Washington Apple Advertising Comm'n., supra. The decline in spectator interest to be inferred from the amended complaint is akin to the loss of accounts that the apple dealers experienced in the Hunt case. In Arlington Heights v. Metropolitan Housing Corp., supra, restrictive zoning ordinances kept a builder from carrying out a specific program to build low-cost housing. The Court ruled there was standing despite the fact that the builder was a non-profit corporation and had suffered no economic injury. In this case the member colleges are prevented from developing their intercollegiate sports programs as they see fit.
 
 
 37
 (B)
 
 
 38
 The Members And The Administrative Procedure Act
 
 
 39
 It is equally clear, in our view, that the members of the NCAA would have standing to sue on their own under the Administrative Procedure Act. This is so whether the question is of "legal wrongs" or of "zones of interests".
 
 
 40
 In Gonzalez v. Freeman, 334 F.2d 570 (D.C. Cir. 1964), a commodity trader barred from doing business with the government sued for declaratory relief under the Administrative Procedure Act. Responding to the government's argument that the trader had no right to contract with the government and thus had not suffered a "legal wrong", Judge (now Chief Justice) Burger wrote for the court:
 
 
 41
 . . . Of course there is no such right ; but that cannot mean that the government can act arbitrarily, either substantively or procedurally . . .
 
 
 42
 The invasion of a legally protected right also constitutes a legal wrong under the meaning of "legal wrong" as used in Section 10(a) of the Administrative Procedure Act. We have already demonstrated that appellants have a right not to be debarred except in an authorized . . . manner; appellants' allegations of the means by which debarment was imposed in this case set forth a claim of invasion of that right and give them standing under Section 10(a).
 
 
 43
 334 F.2d at 574, 575-576. (Footnotes omitted).
 
 
 44
 The legal wrong is even more apparent here. The members of the NCAA own established education businesses; they have made substantial investments in facilities for sports and have operated sports programs as they wished, all under protection of state law. Whether these rights are termed rights of property or of liberty, they are "legal rights", and the unlawful invasion or infringement of these rights, such as the NCAA alleges, is a "legal wrong".
 
 
 45
 In addition to the legal wrong alleged, we believe that the NCAA's interest in invalidating assertedly unauthorized regulations is related in a very close and sensible way to language in Title IX which directs agencies to "effectuate" the statute with regulations "which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." (20 U.S.C. § 1682). The language is a reminder of the limits on who and what an agency may regulate. In connection with the "zone of interests" test generally, it has been said that "the interest in not being subjected to unwarranted regulation can readily be identified as an interest protected by the asserted limits on regulation." Wright, Miller & Cooper, Federal Practice and Procedure, Vol. 13, p. 201. Thus the interests represented by the NCAA are arguably within the "zone of interests" protected by Title IX.
 
 
 46
 Contrary to the view of the District Court, we think a cause-and-effect relation appears between the regulations and the changing operation of intercollegiate athletics programs and that invalidation of the regulations would likely preserve part or all of some NCAA members' existing athletics policies. The appellees argue the amended complaint does not negate the possibilities that institutional free choice, or the dictates of the Equal Protection Clause, state civil rights statutes and equal rights amendments, might be the true cause of the changes occurring in intercollegiate athletics. Construed in favor of the NCAA, however, the amended complaint does suggest that colleges are acting under compulsion from HEW rather than exercising free choice. Assuming, arguendo, that the Fourteenth Amendment and various state laws require precisely the same measures from NCAA members as the challenged regulations do, these laws apply to colleges in some states only, or colleges whose athletics programs constitute "state action", and not to all colleges.
 
 
 47
 Furthermore, the plaintiff, to plead a basis for standing, need not negate all but one of the possible causes of the alleged injury, where, as here, the injury is a change in the status quo, and the plaintiff has identified a likely and sufficient cause of that change, as the challenged regulations appear to be. A more exacting standard of pleading threatens to inflate the standing issue where there is every guarantee of an Article III "case or controversy".
 
 
 48
 The appellees cite Warth v. Seldin, supra, and Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) to support their argument that the amended complaint is not specific enough about injury, the causation of injury, or how the injury can be redressed by judicial action. Neither decision is apposite on that point. The citizen plaintiffs in those cases challenged government rules which did not touch them. They based standing on speculative assumptions about the effect the rules had on third parties not before the courts. From the complaints, it did not appear that changes in the rules would help the plaintiffs. Redress of the injuries depended on how third parties would react. The Supreme Court demanded greater detail in pleading to show that judicial action would not be idle:
 
 
 49
 . . . When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights . . . But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.
 
 
 50
 . . . Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed.
 
 
 51
 Warth v. Seldin, 422 U.S. at 505, 504, 95 S.Ct. at 2208. (Emphasis supplied).
 
 
 52
 The dynamics of the instant case are much simpler. There is the government, which regulates, and the colleges, who are the regulated. In notable contrast to the housing developer plaintiff in the Warth case, who had not committed its resources to a specific project which would run afoul of the zoning ordinance challenged in that case and therefore did not have standing, in this case established enterprises of the NCAA members collide with the challenged regulations. Cf. Arlington Heights v. Metropolitan Housing Corp., supra.
 
 
 53
 (C)
 
 
 54
 Suitability of The NCAA as a Representative
 
 
 55
 Having decided that the member colleges of the NCAA would have standing themselves to challenge HEW's regulation of intercollegiate sports programs, we turn to the issue of whether the NCAA should be permitted to represent its members in this lawsuit. The amended complaint states that among the NCAA's purposes are to "initiate, stimulate and improve intercollegiate athletic programs for student-athletes" and to "uphold the principle of institutional control of, and responsibility for, all intercollegiate sports". The amended complaint discloses injury to intercollegiate sports programs at member institutions, but it also mentions harm to "education programs" generally, which obviously includes much more than intercollegiate sports. The interests of the member colleges go far beyond the NCAA's. However, that alone does not disqualify the NCAA as a representative in this action. This litigation, as we understand it, is an attack upon only those regulations that affect or pertain to intercollegiate sports programs. Thus, "the interests (the NCAA) seeks to protect are germane to the organization's purpose". Hunt v. Washington Apple Advertising Comm'n., 432 U.S. at 343, 97 S.Ct. at 2441.
 
 
 56
 In the usual associational standing case, what the association wants to achieve in the lawsuit is unquestionably what its members want. But the appellees correctly contend that we cannot assume that any of the member colleges supports the NCAA. The NCAA's effort is to overturn regulations which would put the women's intercollegiate sports programs on a par with the men's. Many of the colleges who belong to the NCAA also belong to a women's intercollegiate sports association, the AIAW, which is on the other side of the litigation.
 
 
 57
 The District Court, too, feared that this is a case "in which one educational program within a university seeks judicial leverage against other educational programs indeed against the university as a whole in order to enhance its intra-institutional political power to garner what it deems to be a 'fair share' of the financial resources of the larger educational community and to preserve its departmental autonomy." 444 F.Supp. at 436.
 
 
 58
 There is no "case or controversy" here if unofficial contingents of the colleges and universities are seen cheering both sides of the litigation, while governing bodies of the institutions sit as spectators above the "fight". We hold that when an association does not have standing in its own right, and it is not clear which side of the lawsuit the association's members would agree with, one or more of the members must openly declare their support of the association stance, and they must do so through those officials authorized to bring suit on their behalf. Moreover, if more members of the association declare against the association's position than declare in favor of it, the association does not have standing, for then the parties in the lawsuit most likely would not be adverse.
 
 
 59
 The amended complaint states that "NCAA member institutions, meeting in Convention in January, 1976, were formally advised by the NCAA Council of the possible necessity for bringing this action, and voted to adopt the Report of the Council in which such advice was contained." Favorably construed, this pleading withstands a motion to dismiss. Sham allegations of membership support may be sought out by a motion for summary judgment. Cf. United States v. SCRAP, 412 U.S. at 689, 93 S.Ct. at 2416.
 
 
 60
 (D)
 
 
 61
 Representative Standing And The Issues to be Tried
 
 
 62
 The appellees have contended that this lawsuit requires the individual participation of the members of the NCAA. Such an objection, if well taken, defeats standing of an association. Warth v. Seldin, 422 U.S. at 515-516, 96 S.Ct. at 2214. However, the contention is not well taken here. The NCAA must prove facts conferring standing with respect to at least one of its members (cf. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 114, 99 S.Ct. 1601, 1615, 60 L.Ed.2d 66 (1979)), but otherwise the case presents issues of law common to all members. No damages are sought for the individual members. The NCAA asks for declaratory and injunctive relief, and "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." Warth v. Seldin, 422 U.S. at 515, 96 S.Ct. at 2213; cf. Hunt v. Washington Apple Advertising Comm'n., 432 U.S. at 344, 97 S.Ct. at 2442.
 
 
 63
 After the District Court granted the motions to dismiss, it refused to grant to the NCAA leave to file a second amended complaint. We elect not to discuss that matter.
 
 
 64
 REVERSED AND REMANDED.
 
 McKAY, Circuit Judge, concurring:
 
 65
 I fully agree that the NCAA has standing as representative of its member institutions. I believe, however, that we have no need to decide whether the Association also has standing to sue on its own behalf. The Association seeks no relief that would require us to differentiate between the two bases of standing. Once we have properly found standing on the representational theory, our inquiry should end. I therefore do not join in Part II of the court's opinion, which is mere dictum.