**AMERICAN MINING CONGRESS, United Nuclear Corporation, Homestake Mining Company, Amax, Inc., Solar Lobby, the Environmental Defense Fund, Inc., National Wildlife Federation, Sierra Club, Al Mangan, Chauncey Kepford and Judith H. Johnsrud, Petitioners,**

v.

**Lee M. THOMAS, in his capacity as Administrator of the United States Environmental Protection Agency, and Environmental Protection Agency, Respondents,**

State of Colorado, et al., Intervenors.

**UNITED NUCLEAR CORPORATION, Homestake Mining Company, and Quivira Mining Company, Plaintiffs-Appellants,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Lee M. Thomas, and United States Nuclear Regulatory Commission, Defendants-Appellees.**

Nos. 83-2226, 83-2227, 83-2277, 83-2504, 83-2524, 84-1349, 84-1352, 84-1482 and 84-1908.

United States Court of Appeals, Tenth Circuit.

Sept. 3, 1985.

Anthony J. Thompson (Edward A. McCabe, Charles E. Sliter, Robert F. Reklaitis and Edward S. Shipper, Jr., also of Hamel & Park, Washington, D.C., of counsel, Larry A. Boggs, Sr. Counsel, American Mining Congress, Washington, D.C., with him on briefs), for American Mining Congress.

Peter J. Nickles (Richard A. Meserve, also of Covington & Burling, Washington, D.C., G. Stanley Crout, Sunny J. Nixon, Michael S. Yesley, and Rebecca Dempsey of Stephenson, Carpenter, Crout & Olmsted, Santa Fe, N.M., with him on briefs), for United Nuclear Corp., Homestake Mining Co., and Quivira Mining Co.

Robert E. Yuhnke, Regional Counsel (James B. Martin, Staff Atty., also of Environmental Defense Fund, Boulder, Colo., Roger Beers and Kathryn Burkett Dixon of Beers & Dixon, San Francisco, Cal., and Frances M. Green, Staff Counsel, Nat. Wildlife Federation, Boulder, Colo., with him on briefs), for Environmental Defense Fund, Nat. Wildlife Federation, Sierra Club and Al Mangan.

Barry S. Neuman, Atty. (F. Henry Habicht, II, Asst. Atty. Gen., Land and Natural Resources Div., Margaret N. Strand, Martin W. Matzen and John A. Bryson, Attys., Environmental Defense Section, U.S. Dept. of Justice, Washington, D.C., of counsel, A. James Barnes, Gen. Counsel, Gerald Yamada, Acting Gen. Counsel, William F. Pedersen, Associate Gen. Counsel, Charles S. Carter, Asst. Gen. Counsel, and Christopher C. Herman, Office of General Counsel, E.P.A., Washington, D.C., with him on briefs), for respondents.

Adonis A. Neblett, Asst. Atty. Gen. (Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., and Richard H. Forman, Sol. Gen., Denver, Colo., with him on briefs), for intervenor State of Colo.

Chauncey Kepford and Judith Johnsrud, filed briefs as pro se petitioners.

Richard O. Austermann, Sr. Counsel Regulatory Affairs, Amax, Inc., Golden, Colo., filed briefs for petitioner Amax, Inc.

Before LOGAN and McWILLIAMS, Circuit Judges, and BOHANON, District Judge.[*]

LOGAN, Circuit Judge.

I

These consolidated cases involve challenges to the Environmental Protection Agency's (EPA) standards governing stabilization and control of byproduct materials, primarily mill tailings, at licensed commercial uranium and thorium processing sites (the active mill sites). The EPA established these standards pursuant to its authority under the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), as amended, 42 U.S.C. §§ 2022 and 7901–7942, the same statute that required the EPA to promulgate standards applicable to the inactive mill sites. With the exception of No. 84–1908, jurisdiction in this court is based upon 42 U.S.C. § 2022(c)(2). No. 84–1908 arises out of a district court action in which plaintiffs asserted that the active mill site regulations were promulgated outside the time limits prescribed by the UMTRCA. The district court dismissed the suit on the ground that the exclusive method of review was by petition in the court of appeals under 42 U.S.C. § 2022(c)(2); plaintiffs have appealed that dismissal although they are raising the identical issue regarding timeliness of promulgation under their concurrent petition filed under § 2022(c)(2).

As in the inactive mill site challenges, *see American Mining Congress v. Thomas,* 772 F.2d 617 (10th Cir.1985) [hereinafter *Inactive Sites Case*], petitioners may be divided essentially into two categories: (1) the industry petitioners—the American Mining Congress, a trade association; and joint petitioners United Nuclear Corporation (and its subsidiary Quivira Mining Company) and Homestake Mining Compa-

ny; and (2) the "environmental" petitioners—The Environmental Defense Fund, the National Wildlife Federation, the Sierra Club, the Solar Lobby, Al Mangan, Chauncey Kepford, and Judith Johnsrud. Intervenor, the State of Colorado, aligns itself on most issues with the environmental petitioners. AMAX, Inc. aligns itself with the industry petitioners although it is challenging only the inclusion of molybdenum as a constituent of the nonradiological hazards designated in the ground water portion of the regulations.

The substances to be controlled and the UMTRCA's legislative background have been discussed briefly in the companion case filed this day involving regulations for inactive mill sites. The relevant hazards addressed by the UMTRCA and its legislative history are the same for the active and inactive site regulations, so we need not repeat that discussion here. *See Inactive Sites Case,* 772 F.2d at 621 (part I).

Congress, apparently angered by the EPA's inaction, imposed time limits upon the EPA's authority to formulate regulations to govern the active mill sites. A 1983 amendment to the UMTRCA provided, "If the Administrator fails to promulgate standards in final form under this subsection by October 1, 1983, the authority of the Administrator to promulgate such standards shall terminate" in favor of the Nuclear Regulatory Commission. 42 U.S.C. § 2022(b)(1). The EPA published proposed standards for the active mill sites in the Federal Register on April 29, 1983. 48 Fed.Reg. 19,584 (1983). The Administrator signed final standards on September 30, 1983, and apparently released copies to the public on that day. The regulations did not appear in the Federal Register, however, until October 7, 1983. 48 Fed.Reg. 45,926 (1983) (codified at 40 C.F.R. § 192.30–.43 (1984)).

The EPA's final standards, except those for ground water, were essentially identical

[*] Honorable Luther L. Bohanon, United States District Judge for the District of Oklahoma, sitting by designation.

to those adopted for the inactive mill sites. Standards to be applied after the site closure period were to assure control of radiological hazards "for one thousand years, to the extent reasonably achievable, and, in any case, for at least two hundred years...." 40 C.F.R. § 192.32(b)(1)(i) (1984). The final standards also established radon emission limits not to exceed an average release rate of 20 picocuries per square meter per second (pCi/m²s). *Id.* § 192.32(b)(1)(ii). On-site land that meets the described standard is not subject to the disposal standards elsewhere in the regulations. That described standard, based on the maximum concentration level of radium-226 averaged over areas of 100 square meters, is the same as that at the inactive mill sites: 5 picocuries per gram (pCi/g) averaged over the first 15 centimeters of soil and 15 pCi/g for soil layers more than 15 centimeters below the surface. *Id.* § 192.32(b)(2).

The EPA ground water standards for the active mill sites are in two parts: (1) a primary standard applicable to new waste storage areas, including lateral expansions of existing tailings piles, and (2) a secondary ground water protection standard applicable to both old and new piles. *Id.* § 192.32(a)(1)–(2). In almost all circumstances the primary standard would require a liner under new impoundments and lateral extensions capable of preventing migration of waste into the ground and water. *See* 48 Fed.Reg. at 45,940–41 (discussion of § 192.32(a)(1)–(2) requirements). Liners were not required for existing impoundments, even though new waste could be added. *See id.* at 45,931 (discussion of § 192.32(a)(2) requirements). The secondary standard in effect requires that the ground water be protected by reducing the level of toxic materials in the ground water to concentration limits permitted by the Solid Waste Disposal Act (SWDA), 42 U.S.C. §§ 6901–6986. The regulations necessitate monitoring programs. 40 C.F.R. § 192.32(a)(2) (1984). One SWDA requirement of impermeable cover material was altered in the final regulations to permit permeable cover in arid areas where evapo-

ration exceeds precipitation. *Id.* § 192.-32(a)(1); *see* 48 Fed.Reg. at 45,940 (discussion of basis for alteration). The standards permit exceptions, with the consent of the EPA, for particular existing piles that cannot meet those standards except at extraordinary cost. 40 C.F.R. § 192.32(a)(2)(iv); *see* 48 Fed.Reg. at 45,941 (discussion of potential exceptions). The standards add molybdenum and uranium to the list of hazardous ground water constituents. 40 C.F.R. § 192.32(a)(2)(i).

For purposes of discussion and analysis we divide the petitioners' contentions into four categories: (1) the allegation that the EPA acted beyond its authority because it did not promulgate the regulations within the time requirements of the statute; (2) those arguments sufficiently common to challenges to both the inactive and active mill site regulations that they may be answered, at least in part, by reference to the companion *Inactive Sites Case;* (3) the challenges to the ground water regulations; and (4) AMAX, Inc.'s objection to the addition of molybdenum as a constituent of hazardous material in the ground water regulations.

## II

Petitioners United Nuclear Corporation, Homestake Mining Company, and Quivira Mining Company (hereinafter United Nuclear) assert that the EPA exceeded its jurisdictional authority because it promulgated these regulations after the statutory deadline. In early 1983 Congress passed an amendment to 42 U.S.C. § 2022(b)(1), which provides as follows:

"If the Administrator [of the EPA] fails to promulgate standards in final form under this subsection by October 1, 1983, the authority of the Administrator to promulgate such standards shall terminate, and the [Nuclear Regulatory] Commission may take actions under this chapter without regard to any provision of this chapter requiring such actions to comply with, or be taken in accordance with, standards promulgated by the Administrator."

It is apparently undisputed that the Administrator signed the final regulations on September 30, 1983, and made them available to the public on that day. In the preamble to the regulations the EPA stated, "This standard is promulgated on the date signed." 48 Fed.Reg. at 45,946. The agency filed the regulations with the Office of the Federal Register on October 6; they appeared in the Federal Register on October 7, 1983.

■ The federal district court for the District of New Mexico dismissed a challenge to the regulations' timeliness, holding that judicial review of the rules was vested exclusively in the appropriate court of appeals pursuant to 42 U.S.C. § 2022(c)(2). We have consolidated the plaintiffs' appeal of that ruling with the various petitions for review of the regulations in the proceeding before us. We agree with the district court that all challenges to rulemaking action of the agency, including assertions that the agency acted in excess of its statutory authority or beyond its jurisdiction, should be initiated in the court of appeals. *See FCC v. ITT World Communications, Inc.*, 466 U.S. 463, ——, 104 S.Ct. 1936, 1939, 80 L.Ed.2d 480 (1984). The Administrative Procedure Act authorizes this reviewing court to set aside agency action that is "in excess of statutory jurisdiction, authority or limitation." 5 U.S.C. § 706(2)(C).

Courts considering the statutory periods of limitations for petitions for judicial review of administrative rulemaking, which commonly refer to the date of "promulgation" of rules, *e.g.*, 42 U.S.C. § 2022(c), have held that review petitions are timely if filed within a designated period after publication in the Federal Register. *See Environmental Defense Fund v. Gorsuch*, 713 F.2d 802, 812 (D.C.Cir.1983); *Laminators Safety Glass Ass'n v. CPSC*, 578 F.2d 406, 408 (D.C.Cir.1978). Relying principally upon these cases, United Nuclear argues for a uniform interpretation of the word "promulgate" as meaning publication in the Federal Register. Under that interpretation the EPA acted too late and thus beyond its statutory authority.

■ We agree with those decisions that measure the limitations period for seeking judicial review as beginning on the date of publication in the Federal Register. No doubt many parties affected by a rule first learn of it upon publication in the Federal Register. We believe, however, that "promulgation" does not have a single accepted meaning in all contexts. We agree with the EPA that the purpose of the statutory provision was to compel action by the EPA before October 1, 1983. *See* House Conf. Rep. No. 884, 97th Cong., 2d Sess. 43–45, *reprinted in* 1982 U.S.Code Cong. & Ad. News 3592, 3603, 3613–15. In establishing the deadline discussed here, Congress was actually extending deadlines that the EPA had missed in 1979 and 1980. *See id.* The EPA represents, and the other petitioners do not dispute, that the Administrator signed the rules on September 30, 1983, and released them to the public on that same day. At least one meaning of promulgate is to make public; the EPA's action here effectively achieved that end. We do not think Congress intended to throw away the fruits of EPA's labors simply because it did not *publish* the rule before the end of September. We hold that the EPA met Congress' deadline requirement.

## III

■ Most of the arguments by the various petitioners are substantially identical to those in the consolidated *Inactive Sites Case* decided this day.[1] On the basis of the analysis in that opinion, we again hold:

(a) that a finding by the EPA of a "significant risk" is not a prerequisite to pro-

---

**1.** Some environmental petitioners challenge the EPA's failure to promulgate any regulations controlling radon emissions from the uranium processing itself, as opposed to the end product tailings. This issue was not briefed and is not discussed herein. It has been held in abeyance by court orders requested by the parties pending negotiations between the parties.

mulgating the regulations (*see Inactive Sites Cases*, 772 F.2d at 627 [part III]);

(b) that the EPA may promulgate standards to apply within the boundaries of the mill sites (*see id.* at 629 [part IV]);

(c) that the EPA's standards do not unlawfully impose management, design, and engineering requirements (*see id.* at 630 [part V]); and

(d) that the EPA properly considered cost-benefit factors in establishing standards (*see id.* at 630 [part VI]).

Most of the various petitioners' arguments that the EPA's standards for radon emission and radium in the soil are arbitrary and capricious are also sufficiently discussed in the opinion on the inactive site regulations. We need not elaborate on or repeat that discussion here. Some of the figures with which we must deal are different, however, and a few arguments have changed somewhat between the two sets of cases.

In formulating the active site regulations the EPA estimated more potential lung cancer deaths from the active mill site tailings, absent regulation, than from the inactive mill site tailings: 500 deaths versus 170–240 deaths per century. *See* 48 Fed. Reg. at 45,929 (active sites); *id* at 593 (inactive sites). Although its final regulations for the active sites repeated the 4 in 100 lifetime cancer risk for occupants of houses on tailings in Grand Junction, Colorado—the figure it used in its inactive site calculations—the EPA estimates a 2 in 100 lifetime risk for people living continuously next to "some tailings sites." *Id.* at 45,929. The EPA estimated the cost of active site cleanup at $260 million (1983 dollars) for tailings existing today at licensed sites, but a total of $310 million to $540 million total cleanup cost to the uranium milling industry for all tailings now in existence and to be produced through the year 2000. *Id.* at 45,945. For the standard selected for radon emissions, 20 pCi/m$^2$s, the range of incremental costs per death avoided is estimated from $130,000 (nationwide for 1000 years) to $2.5 million (regionally for 100 years). *Id.* at 45,944–45. *See generally Regulatory Impact Analysis of Final Environmental Standards for Uranium Mill Tailings at Active Sites* 4–1 to 5–39 (detailed EPA costs and benefits discussion). These are significant costs, if the EPA's figures are accurate. But we remain convinced that Congress placed the responsibility for evaluating them upon the EPA without imposing a specific cost-benefit requirement. *See Inactive Sites Case*, 772 F.2d at 630 [part VI]. Therefore, the industry petitioners' arguments that the costs are too high for the benefits gained, and the environmental petitioners' arguments that the industry should be forced to incur the greater costs of standards that would save even more lives, should be addressed to Congress or to the EPA, not to this court. *See American Petroleum Institute v. EPA*, 540 F.2d 1023, 1038 (10th Cir.1976), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977). The EPA has considered and responded to both of these complaints in justifying its actions. *See* 48 Fed.Reg. at 45,933; *see also* II Environmental Protection Agency, *Final Environmental Impact Statement for Standards for the Control of Byproduct Materials from Uranium Ore Processing* A.3–12 to –14 (1983) hereinafter FEIS–AC.

In arguing that the EPA acted arbitrarily and capriciously the American Mining Congress relies upon a 1984 report by a subcommittee of the EPA's Scientific Advisory Board which stated that the EPA "has not assembled and presented a risk assessment that provides a clear and adequate statement of the scientific basis for developing standards to regulate airborne radionuclide emissions." Subcommittee on Risk Assessment for Radionuclides, Scientific Advisory Board, U.S. Environmental Protection Agency, *Report on the Scientific Basis of EPA's Proposed National Emission Standards for Hazardous Air Pollutants for Radionuclides* 34 (1984). The EPA objects to our consideration of this report because it was not in existence at the time the EPA issued its final regula-

tions.[2] Also, the EPA points out that this report addressed the agency's proposed standards in a separate rulemaking proceeding under the Clean Air Act, that it was not based upon a review of the agency's record before us, and that the Scientific Advisory Board criticisms were aimed generally at the manner in which the EPA assembled the information for decision-making rather than being critical of the background documents themselves. We do not believe that report requires overturning the instant regulations. The report itself acknowledges that scientists may differ in regulatory philosophy, adopting different approaches to risk assessment.[3]

Industry petitioners also protest strongly that the EPA acted inconsistently in the way these regulations require addressing the risks compared with other regulations promulgated under other acts: *e.g.,* control of radiation from high toxicity waste. We cannot evaluate here all the factors that caused the EPA to adopt a different approach in connection with its rulemaking under other laws, if indeed it did act differently. The record shows that the EPA did consider and respond to this inconsistency complaint. *See* II FEIS–AC at A.3–2 to –4. We are satisfied that the EPA acted consistently in formulating regulations for the inactive and active mill sites—except with respect to the ground water regulations, which we discuss separately in these opinions. That the EPA may be faulted for its rulemaking under other acts is not the kind of internal inconsistency we found to be arbitrary and capricious in *Squaw Transit Co. v. United States,* 574 F.2d 492, 495–96 (10th Cir.1978).

The American Mining Congress and the State of Colorado make somewhat different arguments that a 5 pCi/g radium standard for land adjacent to a tailings pile is inconsistent with the radon emission standard of 20 pCi/m$^2$s on the pile itself. *See* 40 C.F.R. § 192.32(b) (separate standards listed). We accept the EPA's answer that there is no inconsistency and that the radium cleanup standard was designed to push concentrations in the land sufficiently low to allow unrestricted use, contrary to treatment of the tailings piles. *See* 48 Fed.Reg. at 45,-947; II FEIS–AC at A.5–33.

## IV

■ The EPA adopted a two part ground water standard for active mill sites. 40 C.F.R. § 192.32(a)(1)–(2). The primary standard, requiring use of a "liner," applies only to new waste depositories and to new portions of existing waste depositories. 48 Fed.Reg. at 45,941. The secondary standard, applicable to all impoundments, essentially adopts the standards EPA issued under the Solid Waste Disposal Act (SWDA) for hazardous wastes. *Id.* at 45,-940. It requires monitoring and levels of concentration low enough to meet drinking water standards within 500 meters of the edges of the waste impoundments. *Id.* at 45,940–41.

The American Mining Congress argues that these ground water standards are unlawful because they apply within the boundaries of the mill sites, and because they impose management, design, and engineering requirements. These arguments

**2.** The EPA has filed a motion to strike references to extra-record items cited by the various petitioners. The industry petitioners have moved to supplement the record with these additional materials. For the reasons we state in the *Inactive Sites Case,* 772 F.2d at 626 [part II], we deny the motions to strike and also deny all contested motions to supplement the record.

**3.** The report states:
"[I]n the process of risk assessment, many assumptions must be made. Scientists may be swayed in their choice of assumptions by their underlying regulatory philosophy. The choice of a linear non-threshold dose-re-

sponse relationship compared to a linear quadratic or other relationship is a good case in point. As evidenced by the National Academy of Science's third report on Biological Effects of Ionizing Radiation (BEIR III), knowledgeable scientists disagree on which dose-response relationship is best."
Subcommittee on Risk Assessment for Radionuclides, Scientific Advisory Board, U.S. Environmental Protection Agency, *Report on the Scientific Basis of EPA's Proposed National Emission Standards for Hazardous Air Pollutants for Radionuclides* 7.

do not impress us. We have dealt with the on-site question in the context of radium cleanup and radon emission standards in Part IV of the *Inactive Sites Case*, 772 F.2d 629. We see nothing that compels a different conclusion in the EPA's adoption of ground water standards for active mill sites. The optimal method of preventing pollution of off-site water supplies is to prevent radiological and other hazardous substances from entering the ground water. General application standards that allow the Nuclear Regulatory Commission (NRC) to choose the means of implementation are consistent with the authority Congress vested in the EPA. Although the regulations require a "liner" for new piles and extensions thereof, we understand that term to refer to any impermeable barrier the NRC may approve that will prevent seepage. *See, e.g.,* II FEIS–AC at A.1–28, A.4–7. The regulations require the industry to satisfy SWDA drinking water concentration standards at specified distances from the pile, but they do not dictate the kind of monitoring system that must be used or the method by which purity levels must be achieved. These decisions are left to the implementing agency, the NRC. *See id.,* at A.1–22, A.6–2.

Section 275(b) of UMTRCA states that the EPA's generally applicable standards must provide "protection of human health and environment *consistent with* the standards required under subtitle (C) of the Solid Waste Disposal Act [SWDA], as amended, which are *applicable to such hazards*...." 42 U.S.C. § 2022(b)(2) (emphasis added). The industry petitioners' principal argument against the EPA's ground water regulations is that the standards adopted were regulations for high-toxicity low-volume chemical wastes and the EPA should have analogized to low-toxicity high-volume mining wastes. Thus, the argument is based upon the contention that the EPA did not adopt standards for *similar* hazards. Further, the industry petitioners assert that the mill tailings rest over aquifers unsuitable for use as drinking water and that it is improper for the EPA to establish drinking water standards.

The EPA made findings that conditions at tailing impoundments are not sufficiently different from the conditions it considered in developing SWDA standards to necessitate a change in approach. 48 Fed. Reg. at 45,941; II FEIS–AC at A.1–2 to –3. In its SWDA regulations the EPA refused to draw a distinction between high-volume low-toxicity mining wastes and low-volume high-toxicity chemical wastes. *See* 45 Fed. Reg. 33,140, 33,173–75 (1980) (discussion of basis for decision). Apparently Congress has barred the EPA from applying SWDA regulations to certain mining wastes pending an agency study that was incomplete at the time the EPA was required to promulgate final regulations for the active mine sites. *See* II FEIS–AC at A.1–2 to –3. Yet, the EPA was under pressure from Congress to promulgate license site standards by the October 1 deadline. Congress required the EPA to adopt general standards applicable to all sites. The EPA did adopt such standards. In this circumstance, the EPA acted permissibly in adopting standards equivalent to the drinking water standards.

■ United Nuclear argues that the EPA's ground water standards impermissibly intrude on state control of ground water, a contention that we summarily reject. If United Nuclear has standing to raise the question of preemption, *cf. Mountain States Legal Foundation v. Costle,* 630 F.2d 754, 767 (10th Cir.1980) (denying standing to pro-industry private organization seeking to challenge EPA air quality regulations), *cert. denied,* 450 U.S. 1050 (1981), we are satisfied that the UMTRCA's directive provides the basis for preemption.

The environmental petitioners argue that the ground water regulations are inadequate. They first claim the EPA's decision not to apply the primary standard to existing tailings impoundments is unreasonable because seepage from these sources is already fouling the environment. The EPA's response is that the existing impoundments are only exempted from the primary standard requiring an impermeable barrier.

The impoundments are still subject to the secondary standard. 40 C.F.R. § 192.-32(a)(2). Violation of the secondary standard may require the operator to cease making new deposits and take corrective action. *Id.* § 192.33; *see* 48 Fed.Reg. at 45,941 (discussion of § 192.33). The EPA says it only adopts standards, leaving the methods to achieve the standards to those charged with management of the piles. It also argues that mandatory stoppage of adding to existing piles or removal of existing piles to new, lined impoundments could increase radon emissions and render additional large amounts of land permanently contaminated and unproductive by increasing the number of piles. *See* 48 Fed.Reg. at 19,594–95; II FEIS–AC at A.4–10. We accept as rational the EPA's reasoning on these points.

■ The environmental petitioners also contend that the EPA should require clean-up beyond the site boundaries. The EPA argues in response that the issue is not properly before us because it was not raised during the comment period and because the challenge is in reality one to the SWDA regulations themselves. In addition, the EPA explains that it determined that existing off-site contamination should be addressed through its emergency powers under SWDA and the "Superfund" statute, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9604, 9606. It notes 1984 congressional amendments to SWDA that require some changes in its approach under that act, and admits it must reevaluate its position under the UMTRCA in light of that development which occurred after it issued the active site final regulations. *See* Brief of Respondents at 93 n. 83. We accept as rational this explanation for not imposing requirements for outside-the-boundaries cleanup, and we cannot say the EPA's actions were arbitrary or capricious.

The environmental petitioners assert that the EPA did not properly respond to comments during rulemaking, particularly those concerning "compliance point" monitoring, which suggested that seepage should be monitored in the vadose zone of rocks or sediment to detect pollution before it reaches the aquifers. We are satisfied that the EPA undertook a determined effort to respond to comments during the rulemaking comment period. *See generally* II FEIS–AC at A.1–1 to 7–5 (summarized comments and responses). The record shows that the EPA did respond to comments on ground water compliance point monitoring generally, and possible vadose zone monitoring in particular. *Id.* at A.4–36 to –37 (compliance point monitoring), A.6–2 to –3 (vadose zone monitoring). The response to comments on vadose zone monitoring was somewhat limited—but apparently because implementation of ground water monitoring has been left to the Nuclear Regulatory Commission. *See id.* at A.1–22, A.6–2. We cannot say that the ground water monitoring *guidelines* laid down by the EPA are irrational or unsuited to the task. *See* 48 Fed.Reg. at 45,942 (guidelines listed).

■ Petitioners Kepford and Johnsrud argue that the EPA did not give adequate consideration to deep well disposal of mill tailings. The record shows that the EPA did consider this proposal. *See, e.g.,* 48 Fed.Reg. at 19,590; *id.* at 45,931–32; I FEIS–AC at 8–16. The EPA acted within its powers in rejecting this method, rationally finding it had potential for more serious ground water contamination.

In sum, we reject all challenges to the EPA's ground water regulations for the active mill sites.

### V

AMAX, Inc., one of the world's leading producers of molybdenum, has petitioned for review of the active site regulations for the specific purpose of challenging the EPA's designation of molybdenum as a "hazardous constituent" of uranium and thorium mill tailings and subjecting molybdenum to the ground water protection standards. No other petitioner has focused any attack on the identification of particular minerals as non-radiological hazards. Therefore, before considering the merits of

AMAX's claims we must consider AMAX's standing to raise the issues in its petition. The EPA asserts that AMAX lacks standing to challenge any aspect of the UMTRCA active site regulations because it does not own or operate any licensed uranium mill tailings sites and therefore is not affected by the regulations. The regulations specifically state that molybdenum is listed as a hazardous constituent "only for purposes of controlling uranium and thorium byproduct materials. EPA does not intend in this rulemaking to add molybdenum ... to the SWDA list of hazardous constituents." 48 Fed.Reg. 45,926, 45,944 (1983).

Two sections of the United States Code apply directly to this case. The UMTRCA itself provides that

> "[j]udicial review of any rule promulgated under this section may be obtained by *any interested person* only upon such person filing a petition for review within sixty days after such promulgation in the United States court of appeals for the Federal judicial circuit in which such person resides or has his principal place of business.... The court shall have jurisdiction to review the rule in accordance with chapter 7 of Title 5 and to grant appropriate relief as provided in such chapter."

42 U.S.C. § 2022(c)(2) (emphasis added). Section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702, states that

> "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

The concept of standing combines both constitutional and prudential considerations. *See Allen v. Wright*, — U.S. —, ——, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); *Ozonoff v. Berzak*, 744 F.2d 224, 227 (1st Cir.1984). At a minimum, Article III of the constitution requires

> "the party who invokes the court's authority to 'show [1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and [2] that the injury 'fairly can be traced to the challenged action' and [3] 'is likely to be redressed by a favorable decision.' "

*Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758 (citations omitted).

▮▮▮▮ As a preliminary matter, we note that the reviewing court, when ruling on a motion to dismiss for lack of standing, "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Even reading AMAX's petition and affidavit generously, we hold that it fails to meet either the constitutional or prudential requirements of the standing doctrine.

First, the injury that AMAX claims it would suffer as a result of the EPA's listing of molybdenum as a toxic substance is indirect. Neither AMAX nor its customers own any uranium mill tailings sites. Therefore, they are not subject to the UMTRCA or its regulations. AMAX, however, alleges that state and local agencies that regulate AMAX's customers are likely to restrict or prohibit the discharge of molybdenum if the EPA classifies molybdenum as a hazardous substance. *See* Affidavit of Dr. Gary G. Van Riper (Deputy Director of Environmental Control, Climax Molybdenum Company, division of AMAX). If this should occur, AMAX would be unable to sell its product and would suffer economic injury. Although an indirect injury can be sufficient to confer standing on a party, the Supreme Court has stated:

> "When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights.... But it may make it substantially more difficult to meet the

minimum requirements of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendant's actions, or that prospective relief will remove the harm."

*Warth v. Seldin,* 422 U.S. at 504–05, 95 S.Ct. at 2207–08 (citation omitted).

Although the challenged regulation was adopted over two years ago, AMAX does not refer to a single agency that has restricted or proposed to restrict discharge of molybdenum as a result of this action. AMAX refers only to a *proposed* state regulation in Texas in 1979 classifying molybdenum as a toxic substance that was used as the basis for similar regulations in New Orleans, El Paso, and Dallas. Affidavit of Dr. Gary G. Van Riper at 2–3. Absent any allegation that a single state or local agency has considered adopting the EPA's classification of molybdenum as a hazardous substance, we believe that AMAX has failed to demonstrate that it has or will suffer "concrete and certain harm" as a result of the EPA's action. *National Collegiate Athletic Ass'n v. Califano,* 622 F.2d 1382, 1386 (10th Cir.1980); *see also United States v. SCRAP,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973) ("A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action.").

In reaching this conclusion, we are also influenced by the decision of the United States Court of Appeals for the District of Columbia Circuit in *Association of Investment Brokers v. SEC,* 676 F.2d 857 (D.C. Cir.1982). In that case, the petitioners challenged the Securities and Exchange Commission's (SEC) adoption of revisions to Form U–4, the Uniform Application for Securities Industry Registration. *Id.* at 858–59. The SEC only required broker-dealers that it directly regulated to use the form. *Id.* at 859. However, forty-six states and several self-regulatory organizations, including the National Association of Securities Dealers, Inc. and the New York Stock Exchange, also adopted Form U–4. The petitioners were not subject to the SEC's regulation; instead, they alleged that they were indirectly injured by the SEC when other regulatory organizations and states adopted the SEC revisions. In rejecting standing, the court stated that "[a]n order to the Commission concerning the form could require cancellation or modification of provisions for SECO broker-dealer filings but could not direct the self-regulatory organizations and the states to follow suit." *Id.* at 862. The situation before us is comparable; if state and local agencies follow the EPA and classify molybdenum as a toxic substance, AMAX's complaint should be raised before these entities. Indeed, it is possible that the EPA's classification of molybdenum will cause state and local entities to initiate their own investigations of the toxicity of molybdenum. If so, it would be the rules adopted as the result of such investigations that might injure AMAX, not the EPA's actions under an act that does not regulate AMAX's business.

Even if we were to find that AMAX has met the constitutional requirements for standing, we would have to deny it standing based on prudential factors. The Supreme Court recently described the prudential aspects of a court's determination of standing:

"Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."

*Allen v. Wright,* —— U.S. ——, ——, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

Although several courts have questioned the continued viability of the zone of interests aspect of the standing doctrine, the Supreme Court has continued to apply it. *Id.* at 5114. This circuit has been lenient in applying the "zone of interest" test. We

have said that "unless the legislative history shows the plaintiff to be clearly *not* within the statute's 'zone of interest,' and it rarely does, a court should demand no more than a sensible relation between some subject of the statute and the plaintiff's interest in the outcome of the litigation." *National Collegiate Athletic Ass'n v. Califano,* 622 F.2d at 1386. The EPA specifically disclaims any treatment of molybdenum as a toxic substance other than for purposes of mill tailings byproducts disposal. *See* 48 Fed.Reg. at 45,949. Even generously interpreting the test, particularly in the face of this disclaimer, it is difficult to read the UMTRCA as a statute that in any way intends to regulate producers such as AMAX who do not own or operate any licensed mill tailings sites.

Although AMAX correctly states that direct regulatory impact is not required for a petitioner to come within the interests test, the cases on which it relies involved a far more direct regulatory impact than AMAX alleges that it might incur. In *Cotovsky-Kaplan Physical Therapy Assoc., Ltd. v. United States,* 507 F.2d 1363 (7th Cir.1975), for example, the plaintiffs, five professional physical therapy corporations, were permitted to challenge HEW regulations that conditioned Medicare payments to home health agencies on their hiring of nonprofit physical therapy corporations. *Id.* at 1364–65. As a result of those regulations, several home health agencies notified plaintiffs of their intent to terminate their contracts. *Id.* In allowing the private corporations to challenge the regulations, even though they did not apply directly to them, the court stated that

> "if, pursuant to what it perceives to be its statutory authority, a government agency regulates the contractual relationships between a regulated party and an unregulated party, the latter as well as the former may have interests that are arguably within the regulated zone for purposes of testing standing, ..."

*Id.* at 1367. In contrast, neither AMAX, its customers, nor the state and local agencies that might adopt the EPA regulations are regulated under the UMTRCA.

In addition, in each of the cases that AMAX cites, the plaintiff was injured when an agency effectively forbade a third party from entering into or continuing a beneficial relationship with the plaintiff. *See Cotovsky-Kaplan Physical Therapy Assoc. Ltd. v. United States, supra; Apter v. Richardson,* 510 F.2d 351 (7th Cir.1975) (subject on behalf of whom application for government grant was submitted entitled to challenge denial of grant).[4] In the instant case, however, the EPA has exercised no authority over either AMAX or its customers.

Accordingly, based on both constitutional and prudential factors, we deny AMAX standing and do not consider its arguments on the merits.

## VI

The challenges of all petitioners are rejected; we affirm the validity of the active mill site regulations.

---

**4.** AMAX also cites *New Jersey Chapter Incorporated of the American Physical Therapy Ass'n v. Prudential Life Ins. Co.,* 502 F.2d 500 (D.C.Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1444, 43 L.Ed.2d 762 (1975). In this decision, however, the court never decided the standing issue because it determined that, regardless of standing, the defendants would prevail on the merits. *Id.* at 504.